[No. S004527. Crim. No. 23126. Jan. 23, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER EDELBACHER, Defendant and Appellant.

992

**COUNSEL**

Jeffrey B. Kupers, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, J. Robert Jibson, Raymond L. Brosterhous II and Cynthia G. Besemer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, J.**—Defendant Peter Edelbacher appeals from a judgment of death under the 1978 death penalty law following his conviction on a jury verdict of the first degree murder (Pen. Code, §§ 187-189; all further references are to the Penal Code unless otherwise stated) of Lela Schwartz-Edelbacher (Lela), with special circumstance findings that the murder was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)) and that defendant intentionally killed the victim while lying in wait (§ 190.2, subd. (a)(15)) and with a finding that a firearm was used in the commission of the murder (§ 12022.5). On a plea of guilty, defendant was also convicted of solicitation to murder Signe McClure (§ 653f, subd. (b)).[1] The appeal is automatic. (§ 1239, subd. (b).)

We shall affirm the judgment as to the findings of guilt and special circumstance but will reverse the penalty of death and remand the matter for a new penalty trial. Reversal of the penalty verdict is required because the jury at the penalty phase may have been misled to defendant's prejudice about the nature of the penalty determination process and the scope of its sentencing discretion.

---

[1] The information had also charged defendant with oral copulation (§ 288a) and forcible rape (§ 261) against Signe McClure and burglary (§ 459) of her residence. These counts were severed for trial and later dismissed on the prosecution's motion at the sentencing hearing.

## I. FACTS AND PROCEEDINGS

A. *The Prosecution's Case.*

Defendant and Lela were married in 1977 and they had one child, a son. Lela had separated from defendant and had commenced proceedings to dissolve the marriage when she reported to police, in May 1980, that defendant had raped her. Defendant was arrested and released on bail. A few days later, defendant told Lela he would "blow her fucking head off" if she "went through with this" (referring to the rape prosecution, the marital dissolution, or both).

Defendant and Lela agreed to share custody of their child. A temporary support order was entered requiring defendant to pay Lela $150 per month in child support, effective June 1980. In January 1981 Lela obtained an assignment of defendant's wages because he was $700 in arrears. In February 1981 defendant was tried and acquitted on the charge of spousal rape. During the same month, an interlocutory judgment was filed awarding the bulk of the community property (a 44-acre ranch) to defendant and requiring him to pay Lela $48,730.50 for her interest in the property no later than April 18, 1981.

In March 1981 one of defendant's automobiles was repossessed. A 12-gauge shotgun and a box of shells which were in the vehicle at the time of repossession were returned to defendant. On March 31, defendant's mother deposited $48,500 in a savings account. Defendant's parents had borrowed the money for defendant's use to pay Lela but the bank employee who handled the deposit told defendant his mother had expressed reluctance to lend him the money. When informed of his mother's reluctance, defendant seemed unconcerned.

On April 3, 1981, Lela spent the evening at a friend's house, returning to her parents' house, where she was then living, shortly after 11 p.m.[2] A few minutes later a blast shook the house. Lela's parents found her lying on the floor of her room, fatally wounded, having been shot in the back. There were holes in the window glass and curtains and the room smelled of gunpowder.

Police detectives found partial shoeprints outside the bedroom window. Based on the angle of shotgun pellet holes in the bedroom wall, it appeared

---

[2] The child was in defendant's custody on the night in question pursuant to an agreement under which the child spent alternating two-week intervals with defendant and Lela.

the shooter had been standing about eight feet from the window, which was consistent with the location of the shoeprints.

On the following morning investigators went to the home of defendant and his parents, where they took casts and photographs of shoeprints found in areas where defendant had walked. Although these prints were similar to the prints at the murder scene, it could not be determined whether they had been made by the same shoe and no charges were filed against defendant at that time.

Defendant met Signe McClure (McClure) in June 1981 and they began dating. On December 4, 1981, defendant mentioned that his son, who was now living with him full-time, frequently awoke about midnight and cried for Lela. McClure said the boy probably awoke at that time because it was about the time Lela was killed. Defendant told McClure "he could still see Lela walking across the floor the night the incident happened." McClure did not respond to this statement. Defendant called McClure the next day and asked if she remembered everything they had discussed the night before. McClure said she remembered "most of the things" they had discussed.

Defendant had a conversation with his friend, Phil Green, on or about December 14. Green said one of his guns had been missing for several months, only three people had known where he kept his guns, and he had ruled out everyone but defendant. Green said he did not understand what would cause a person to kill someone. Defendant replied: "Lela knew something was going to happen." A short time later defendant said, "God, I wish they would just throw me in jail. I wish this whole thing was over with."

On or about December 14 defendant also had a discussion with McClure. Defendant said Phil Green had asked him why it had been necessary to do what he did and had said there were other ways to work out the problems concerning his son's custody and the ranch. McClure asked if Lela had been killed with Phil Green's gun and defendant said, "it was the gun." When McClure asked defendant why he did what he did, defendant replied: "I had to do what I had to do." On December 22, 1981, McClure told defendant she wanted to terminate their relationship.

Defendant met with McClure's former husband Michael on January 4, 1982. Defendant said his wife had been killed after the spousal rape case and it "really worked out good." Defendant suggested the same thing could happen to McClure because defendant knew "some people who could take care of the problem for [Michael] or [defendant] could." Defendant said

Michael would have custody of his son and would not have to pay support if McClure was gone.

On January 8, 1982, defendant entered McClure's residence wearing gloves and a ski mask that completely covered his face. Defendant was carrying a sawed-off shotgun. Defendant ordered McClure to lie on the floor and said she knew too much. Defendant taped her mouth and handcuffed her hands behind her back and ordered her into her bedroom. Defendant said it would make too much noise if he shot the gun in the house so he had an alternate plan but he did not explain what the plan was. Defendant left about four hours after he arrived.[3] McClure reported the incident to the police and defendant was arrested later that night. In defendant's van were gloves, a full-face ski mask and handcuffs but no weapons.

Defendant was visited in jail on January 27, 1982, by his brother Chris. Their conversation was monitored and recorded. Defendant said there was something he wanted Chris to take care of. Defendant wrote "hit Signe" on a piece of paper which he showed to Chris. Defendant told Chris to do this before the preliminary hearing scheduled for March and offered his Corvette to Chris. Defendant said "it" (i.e., killing McClure) was the only way he could get out of jail quickly. Defendant wrote the name Jeff Denise on the paper and suggested Chris might ask Denise to do "it" for "a few G's" (i.e., a few thousand dollars). Using veiled language, gestures, and a few written words, defendant outlined a plan by which a person would enter McClure's house, open drawers to give the appearance of a burglary, and shoot McClure when she returned to the residence. As he explained the plan defendant displayed a diagram he had drawn on the paper showing McClure's residence. At one point defendant said: ". . . it's easy, take it from me . . . [e]specially if you don't even have to look, you know, just— . . .—you just make sure you got the right one coming in . . . ." This conversation formed the basis of the charge of solicitation to commit murder.

Defendant also offered to pay $100,000 to William "Skip" Johnson, a fellow jail inmate, if Johnson killed McClure. Johnson asked whether defendant had killed Lela. Defendant replied by asking Johnson what Johnson would do if a woman took his child, started divorcing him behind his back, and took all his money. Johnson said he thought he would kill her. Defendant said: "I rest my case."

---

[3] The rape and oral copulation which were the subject of the severed counts (see fn. 1, *ante*) allegedly occurred during this four-hour period but evidence of these offenses was excluded at the guilt phase of the trial and was not offered at the penalty phase.

## B. *The Defense.*

Defendant testified that on the day of Lela's murder he spent the evening with a friend named Carol Leos. They met approximately 8:30 p.m., went to a restaurant where they each had two glasses of wine, and then about 10:30 p.m. they went to a party. Defendant decided not to stay and telephoned his brother Stefan, asking to be picked up at a church. Carol Leos drove defendant to the church and waited 10 to 15 minutes with him before leaving. Stefan arrived a few minutes later and drove defendant to Stefan's apartment. After 15 to 30 minutes Stefan received a telephone call from Diana Valencia reporting that Lela had been shot. Defendant then went to the apartment of a woman named Sheila Butler where he spent the remainder of the night.

Although he realized he was suspected of having killed Lela, defendant did not tell his attorney, Sheila Butler, or his parents that he had been with Carol Leos the night Lela was killed. He explained at trial that he did not consider Leos his alibi because he was not sure when Lela was killed. Leos died in November 1981.

## C. *Rebuttal.*

Darila Bray testified that on the night Lela was killed he went out drinking and dancing with Carol Leos, his close friend and former sister-in-law. He could remember it was that night because Leos called him the next morning and said the wife of a man she had dated had been killed the night before.

## D. *Penalty Phase.*

The prosecution offered no evidence at the penalty phase. Defendant's witnesses included several friends and acquaintances who testified that defendant came from a loving, hard-working family, was devoted to his son, seemed to have a rapport with children, was a hard-working and "very responsible" person, and had been regarded as a leader during junior high and high school. Defendant's mother said he was a loving brother to his siblings, and a good husband and father. She attributed most of defendant's marital problems to financial pressures and said defendant had participated in counselling in an attempt to save the marriage.

## II. PRETRIAL AND JURY SELECTION ISSUES

A. *Motion for Change of Venue.*

Defendant brought a pretrial motion, on grounds of prejudicial publicity, to change venue away from the County of Fresno, where the killing of Lela occurred. Defendant contends that denial of the motion was error.[4]

 When the defendant shows a reasonable likelihood that a fair trial cannot be had in the county of original venue, a motion for change of venue must be granted. (§ 1033; *People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) The five most significant factors to be considered are the gravity and nature of the crime, the extent and nature of the publicity concerning it, the size and nature of the community, the status of the victim, and the status of the accused. (*Ibid.*) A reviewing court makes an independent appraisal of these factors whether the issue is raised by pretrial writ petition or by postconviction appeal. (*Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 382 [66 Cal.Rptr. 724, 438 P.2d 372].) On postconviction review, however, the court will also examine the voir dire to determine whether the pretrial publicity in fact had a prejudicial effect. (*Balderas, supra,* at p. 177; *People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].)

Defendant was accused of first degree murder with special circumstance allegations. Capital murder is the most serious of offenses, and thus the first factor weighs in favor of a venue change. The seriousness of the offense is not sufficient in itself, however, to require a venue change. (*Balderas, supra,* 41 Cal.3d at p. 177; see *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 942 [187 Cal.Rptr. 455, 654 P.2d 225]; *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 583-584 [174 Cal.Rptr. 701, 629 P.2d 502].) Upon examination of the other factors and the voir dire, as will appear, the record fails to demonstrate a reasonable likelihood that a fair trial was not obtainable in Fresno County.

Because the charge was capital murder, it is not surprising that the case received extensive publicity. In support of the motion to change venue, defendant introduced evidence of television and newspaper coverage of developments in the case. The television coverage consisted of broadcasts on 16 dates by station KSEE, 10 dates by station KFSN, and 13 dates by station KJED. The newspaper publicity consisted of 21 news articles appearing in the Fresno Bee. Two newspaper articles concerned only the

---

[4]Defendant attempted unsuccessfully by writ petition to have the denial of the venue motion set aside.

spousal rape case and the second of these focused on defendant's acquittal. Four articles appeared at the time of Lela's death. Nine articles appeared in the weeks following defendant's arrest; these articles discussed the charges against defendant for the rape of McClure and the solicitation of her murder as well as the murder charge itself. The remaining articles appeared during or after the preliminary hearing and reported the court proceedings.

Most of the newspaper articles were relatively short and there is no evidence they were prominently placed in the paper. The articles frequently noted that defendant had been the first person tried for spousal rape in Fresno County, but all references to the spousal rape charge noted defendant had been acquitted of the charge. Lela's murder was not characterized as "cold-blooded" or "execution-style" or otherwise sensationalized. (See *Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 593 [194 Cal.Rptr. 492, 668 P.2d 799].) Only seven articles carried defendant's name in the headline and none of the headlines referred to the death penalty. The tone of the publicity—both television and newspaper—was factual rather than inflammatory. The media coverage did not insinuate defendant's guilt and was sporadic, responding to developments in the case, rather than continuous. The publicity was not excessive, unfair, or unusual in light of the seriousness of the charges.

In his supplemental brief on appeal, defendant has submitted copies of additional news articles from the Fresno Bee and has requested that we take judicial notice of them as facts "not reasonably subject to dispute and . . . capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."[5] (Evid. Code, § 452, subd. (h).) Under Evidence Code section 459, this court "may" take judicial notice of such matters. However, these articles had not appeared when the trial court ruled on the motion for charge of venue and the motion was not later renewed. Accordingly, we decline the request to take judicial notice.

Fresno County is the 14th most populous of the 58 counties in the state, with a 1983 estimated total population of 551,200. (State of Cal., Statistical Abstract (1984) table B-3, p. 15.) As we noted in *Balderas,* cases in which venue changes have been granted or ordered on review "have usually involved counties with much smaller populations" because the larger the local population, the more unlikely it is that preconceptions about the case have

---

[5] The articles in question begin chronologically with the denial of the venue change motion and continue through the trial. The majority of the articles appeared after jury selection commenced and are therefore of little relevancy since the jurors presumably obeyed the admonition not to read anything about the case. Like the other articles previously considered, they are factual and fair reports of public proceedings. While defendant's name appears more often in the headlines than in the earlier articles, they are not otherwise remarkable.

become imbedded in the public consciousness. (*Balderas, supra,* 41 Cal.3d at pp. 178-179.)

The remaining factors, the community status of the victim and the defendant, do not demonstrate a necessity to change venue. Defendant was not a friendless outsider or a minority group member. He had lived most of his life with his family in Fresno County and in neighboring Madera County. The victim was not especially prominent in the community. As a young mother she was undoubtedly a sympathetic figure but there is nothing in the record to indicate that her death caused unusual emotion in the community.

The record reflects that more than 100 prospective jurors were examined on exposure to pretrial publicity (others were excused before being asked about pretrial publicity). Each prospective juror was questioned on this subject out of the presence of the other prospective jurors. Approximately 70 percent of those examined had heard something about either this case or the earlier spousal rape case, although many could recall no details. Of these jurors, 15 were excused for cause.

Of the 12 actual jurors,[6] 9 could not recall receiving any information about the case before being summoned for jury duty.[7] The other three had vague recollections of media accounts of the case but stated they did not remember any details. Only three jurors stated they recalled something about a spousal rape trial. One believed the trial had not been in Fresno but "up north somewhere," another stated he remembered no details, and the third was asked no further questions. Defendant's counsel was able to select this jury while using only 18 of his 26 peremptory challenges. The failure to exhaust peremptories is a strong indication "that the jurors were fair, and that the defense itself so concluded." (*Balderas, supra,* 41 Cal.3d at p. 180.)

Defendant relies on a survey showing that a substantial percentage of the county's population had some awareness of the case but as noted in *Balderas,* this is to be expected given the realities of modern communications and the attention given to murder prosecutions. The issue is not awareness of the particular case but the jurors' ability to lay aside any impressions they may have received and decide the case on the trial evidence. On this point, defendant cites the survey's finding that 78 percent of those surveyed believed "the right person ha[d] been apprehended." However, the survey also reported that only 20 percent stated they had an opinion as to defendant's guilt or innocence and only 15 percent said they could not disregard anything they might have heard or seen about the case and base their decision

---

[6] One of these was selected as an alternate and substituted in place of a juror who became ill during trial.

[7] Two of these jurors heard news accounts after being summoned but before the voir dire.

entirely on evidence presented in court. While these survey responses might otherwise be cause for concern (see *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 590), any inference that an impartial jury could not be impaneled was refuted by the actualities of voir dire.

We conclude defendant has failed to demonstrate a reasonable likelihood that denial of his venue change motion resulted in the denial of a fair trial.

B. *Motion to Suppress Jailhouse Conversation Tape.*

On January 27, 1982, about three weeks after his arrest, defendant was visited in jail by his brother Chris. The visit took place in the bond room of the jail. During their conversation defendant solicited Chris to murder McClure. The conversation was surreptitiously monitored and a tape recording was made. The monitoring was conducted pursuant to an order issued by a magistrate on application by the district attorney.

Defendant moved under section 1538.5 to suppress the tape and all evidence of the conversation. At the hearing on the motion it was stipulated that the monitoring's purpose was not institutional security. The prosecution argued that its purpose was to protect McClure and other prosecution witnesses but defendant maintained that the only purpose was to gather evidence to be used against defendant. Following the testimony of several witnesses, the court denied the motion finding, inter alia, that defendant suspected the conversation was being monitored and thus did not entertain a subjective expectation of privacy.

Defendant contends that the monitoring violated his right to privacy as established by *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]. Defendant recognizes that *De Lancie* was held to be prospective only in *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], but he nonetheless urges us to apply *De Lancie* retroactively to the present case because it is a death penalty case and because *Donaldson* was based on constitutional considerations rather than the express provisions of section 2601, subdivision (d). The contention is not meritorious.

*De Lancie, supra,* 31 Cal.3d 865, was filed on July 8, 1982, several months after the taping at issue here. In *Donaldson, supra,* 35 Cal.3d at page 39, we held *De Lancie* does not apply to police conduct which took place before the decision was filed. Our decision not to apply *De Lancie* retroactively makes no exception for cases in which a judgment of death has been imposed. (See, e.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 85 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Our decision not to accord retroactive application to *De Lancie* was given with full recognition of both the statutory and constitutional bases of that decision: "Although based in part on an interpretation of two 1975 statutes, Penal Code sections 2600 and 2601, *De Lancie* was clearly not a simple application of the statutory language. Prior cases had held that at least as to nonprivileged conversations there existed no right of privacy in a jail or police station, and if that doctrine prevailed, mere application of the language of sections 2600 and 2601 would offer no protection. Thus, in its departure from past precedent, even though in the context of statutory interpretation, *De Lancie* appears to represent the type of break from prior law which may justify nonretroactivity . . . ." (*Donaldson, supra,* 35 Cal.3d at p. 37.)

In any event, the trial court's finding that defendant had no subjective expectation of privacy is supported by substantial evidence. During the conversation defendant never mentioned McClure by name and never used the word "kill" or "murder." Defendant wrote "hit Signe" on a pad of paper which he showed to his brother and in the subsequent conversation used veiled allusions and awkward circumlocutions to refer to the intended murder and the manner in which he wanted it carried out. Defendant's own conduct thus provides sufficient grounds for rejecting his privacy claim. (See *Miranda, supra,* 44 Cal.3d at p. 85, fn. 10; *Donaldson, supra,* 35 Cal.3d at p. 34, fn. 7.)[8]

C. *Motion to Suppress Testimony of Prosecution Witness.*

As part of his pretrial motion to suppress evidence (§ 1538.5), defendant moved to suppress Chris's testimony as being the fruit of the jailhouse tape, which defendant claimed was illegally obtained, and as the fruit of an illegal arrest of Chris. The motion was denied. Defendant now contends that Chris's testimony should have been excluded as the fruit of an unlawful arrest of Chris and as the fruit of coercive interrogation procedures.

After the recording of the January 27, 1982, jailhouse conversation between defendant and Chris, a surveillance was initiated at McClure's residence.[9] On February 3, the porch light at the residence was shot out by a pellet gun. The gun was fired from a vehicle which left the area before

---

[8] Our conclusions make it unnecessary to decide whether violation of *De Lancie* requires suppression of evidence, whether detainee-visitor conversations may be monitored for the purpose of protecting prosecution witnesses (see *De Lancie, supra,* 31 Cal.3d at pp. 876-877, fn. 12), and what significance, if any, should be given to the magistrate's order authorizing the monitoring.

[9] Warned that she was the target of a murder solicitation, McClure had not been living at the residence.

surveilling officers could stop it or record its license number. Detective Johanssen, who was heading the investigation, did not learn of the incident until the morning of February 5. He immediately went with another officer to Chris's residence. When Chris stepped out onto the front porch, the officers placed him under arrest for conspiracy to commit murder. After giving him a *Miranda* advisement (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), the officers played the tape of the jailhouse conversation and questioned Chris about its contents. Several days later, after counsel had been appointed to represent him, Chris agreed to testify in defendant's trial in exchange for immunity from prosecution.

▐ A motion under section 1538.5 may be used to suppress evidence which is claimed to be the fruit of Fourth Amendment violations, such as an illegal arrest, but it may not be used to suppress statements on the ground they were involuntarily induced contrary to Fifth Amendment protections. (*People* v. *Campa* (1984) 36 Cal.3d 870, 885 [206 Cal.Rptr. 114, 686 P.2d 634]; *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896-897, fn. 6 [135 Cal.Rptr. 786, 558 P.2d 872].) A pretrial ruling on a claimed Fifth Amendment violation is subject to reconsideration by the trial court, and objection on Fifth Amendment grounds to the admissibility of evidence is waived if not made at trial when the evidence is offered. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 244 [233 Cal.Rptr. 404, 729 P.2d 839] (conc. opn. of Grodin, J.); *People* v. *Campa, supra,* at p. 885; *People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 735 [125 Cal.Rptr. 798, 542 P.2d 1390].) As defendant did not object to Chris's testimony at trial, the only issue preserved for review is whether it was the product of an illegal arrest.

As both the charged crime and the arrest at issue took place before the effective date of Proposition 8 (Cal. Const., art. I, § 28), the issue is governed by the law in effect at that time. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) Under California's then existing vicarious exclusionary rule (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 161 [98 Cal.Rptr. 649, 491 P.2d 1]; *People* v. *Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855]), defendant has standing to seek suppression of evidence based on claimed violations of the Fourth Amendment rights of third persons, in this instance his brother Chris.

▐ Cause to arrest exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime. (*People* v. *DeVaughn, supra,* 18 Cal.3d 889, 895.) Defendant contends there was no cause to arrest Chris for conspiracy to commit murder because there was no evidence of an overt act in furtherance of an agreement between Chris and

defendant to murder McClure. (See § 184 ["No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done."].)

When Chris was arrested, the officers had possession of the jailhouse tape in which defendant asked his brother to murder McClure, either personally or by hiring another person, and Chris agreed to do so. A few days later the porch light of McClure's residence was shot out. While there was no direct evidence to connect Chris to this incident, it was sufficient to generate an honest and strong suspicion that an overt act in furtherance of the conspiracy had been committed. The arrest was not invalid.

### III. Guilt and Special Circumstance Trial Issues

A. *Admissibility of Jailhouse Conversation.*

Defendant contends that the tape recording and other evidence of the jailhouse conversation during which he solicited his brother Chris to murder McClure should have been excluded because the evidence was not relevant to any contested issue of fact, because it was inadmissible evidence of character or propensity, and because the risk of undue prejudice exceeded any probative value the evidence possessed.

After jury selection, defendant moved to withdraw his plea of not guilty to the charge of solicitation of murder and to enter a plea of guilty to that charge. Following advisement of constitutional rights and plea consequences per *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], the motion was granted and defendant's quilty plea was accepted. In response to the court's questions defendant said he asked his brother to kill McClure to prevent her from testifying against him on the charge of murdering Lela.

Defendant then moved to exclude evidence of the conversation during which the solicitation was made on the ground it was irrelevant to any remaining issue or that any probative value it might have was exceeded by the risk of undue prejudice. As part of the motion, defendant offered to inform the jury by stipulation of the guilty plea to the charge of solicitation. The prosecutor opposed the motion, arguing that the evidence was relevant to prove consciousness of guilt for the murder of Lela, to corroborate McClure's testimony, and to prove that defendant had murdered Lela by lying in wait. The trial court denied defendant's motion, finding that the evidence was relevant to prove consciousness of guilt and the special

circumstance of lying in wait, and that the probative value of the evidence exceeded the risk of undue prejudice. On defendant's further motion, the prosecutor agreed to excise two short passages in the tape. As part of the prosecution's case-in-chief, the tape of the jailhouse conversation was played for the jury and defendant's brother Chris testified concerning its contents.

 Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883].)

*Consciousness of guilt.* A defendant's willful suppression of evidence, or willful attempt to suppress evidence, is admissible to prove consciousness of guilt. (Evid. Code, § 413; *People* v. *Weiss* (1958) 50 Cal.2d 535, 554 [327 P.2d 527]; *People* v. *Wong* (1973) 35 Cal.App.3d 812, 831 [111 Cal.Rptr. 314].) Defendant concedes that evidence of the solicitation of murder tended to prove consciousness of guilt as to Lela's murder but he maintains it was nonetheless inadmissible because he offered to stipulate to the underlying facts. We disagree.

The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness. (*People* v. *McClellan* (1969) 71 Cal.2d 793, 802 [80 Cal.Rptr. 31, 457 P.2d 871]; see also, *People* v. *Hall* (1980) 28 Cal.3d 143, 153 [167 Cal.Rptr. 844, 616 P.2d 826]; *People* v. *Robles* (1970) 2 Cal.3d 205, 213 [85 Cal.Rptr. 166, 466 P.2d 710]; *Fuentes* v. *Tucker* (1947) 31 Cal.2d 1, 7-8 [187 P.2d 752].) In the present case defendant did not offer to stipulate to consciousness of guilt as to Lela's murder or to any element of the charge against him. The proposed stipulation concerned only the bald fact of a solicitation to murder McClure to prevent her testimony on the charge of murder. Defendant's position at trial was that he was innocent of the murder charge, that McClure's testimony was materially false, and that he solicited her murder because he feared her false testimony would result in his conviction for a crime he did not commit. Whether consciousness of guilt of Lela's murder should be inferred from the solicitation was therefore a disputed issue the resolution of which would be aided by a thorough examination of the manner in which the solicitation occurred and of the exact words used. Accordingly, the prosecution was not required to accept the proposed stipulation.

*Evidence of lying in wait.* Another basis of admissibility was that defendant's statements provided evidence of the lying-in-wait special circumstance.

During the recorded conversation defendant suggested that his brother, or some person hired by his brother, enter McClure's residence on a weekday morning when no one was at home, open drawers to give the appearance of a routine burglary, watch at the window for McClure's arrival, and shoot her as she entered her residence. On the tape, defendant is heard to say: "Once you're in you can go all the way up the window, the front ones, and you can watch the driveway and see when it comes back up again. . . . You can be ready and as soon as she, you know, opens, you know, gets ready to walk in you can just right through the, you know . . . right there, you don't even have to look . . . it's going to make a little noise, the thing is you don't want, uh . . . be that long, but it's easy, take it from me. . . . Especially if you don't even have to look, you know, just . . . you just make sure you got the right one coming in . . . ."

The prosecutor argued that defendant's statements—i.e., "it's easy, take it from me"—constituted an admission that he had killed someone in a manner similar to what he was suggesting for the murder of McClure. Given the other evidence presented at trial, it was a reasonable inference that defendant was referring to the shooting of Lela. Because the method proposed for the killing of McClure included lying in wait, the jury could reasonably infer that the murder of Lela had also been committed by lying in wait.

Defendant contends that the tape was not admissible to prove the lying-in-wait special circumstance because the marks common to the two offenses were insufficient both in number and in distinctiveness to warrant an inference that the method proposed for the murder of McClure also provided an accurate description of the method by which Lela was murdered.

Defendant relies on cases in which the prosecution sought to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses using the same distinctive modus operandi. (See, e.g., *People* v. *Rivera* (1985) 41 Cal.3d 388, 392 [221 Cal.Rptr. 562, 710 P.2d 362]; *People* v. *Bigelow* (1984) 37 Cal.3d 731, 749 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Haston* (1968) 69 Cal 2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91].) In this context we have stated that admissibility "depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity." (*People* v. *Bigelow, supra,* at p. 749.)

Unlike the cases on which defendant relies, however, the offenses here were linked by more than just the manner of their commission; they were linked factually in that McClure was to be a witness against defendant for the murder of Lela and, more importantly, they were linked by defendant's own words. Defendant's statement ("it's easy, take it from me") impliedly admitted his commission of a crime separate from but similar to the proposed murder. This admission and the fact that all of the other-crimes evidence offered by the prosecution consisted of defendant's own statements and gestures are features which distinguish this case from those cited by defendant.

The inference that the other crime to which defendant alluded was the murder of Lela likewise did not depend solely on a distinctive modus operandi common to the two crimes. Evidence supporting this inference included the testimony of McClure's former husband Michael concerning defendant's suggestion that what had happened to Lela could also happen to McClure. This evidence indicated that defendant himself viewed the contemplated killing of McClure as being similar to and in some manner a repetition of the killing of Lela.

We conclude that demonstrating a number of distinctive common marks was not a requirement for the admissibility of the jailhouse conversation evidence to prove the lying-in-wait special circumstance.

*Risk of undue prejudice.* Defendant contends the tape should have been excluded under Evidence Code section 352 because it contained irrelevant and prejudicial matters, including references to property disputes between defendant and Lela's parents, a statement by defendant that he was "not real 100 percent sure of my lawyer," an unidentified person's reported comment that defendant was "a crazy son-of-a-bitch," and numerous instances of offensive language. The reference to defendant's lawyer was relevant to his motive in wanting McClure killed and the jury was not informed by the prosecution that the comment referred to the attorney who represented defendant at trial. Jurors today are not likely to be shocked by offensive language and any risk of prejudice here was outweighed, as the trial court determined, by the probative value of the evidence. Regarding the other matters, it is sufficient to observe that defendant failed to request their deletion despite the trial court's invitation to make such requests (as noted, the prosecution agreed to several deletions). Defendant has failed to demonstrate an abuse of discretion in the denial of his motion to exclude under Evidence Code section 352.

*Other-crimes instruction.* At the request of both the prosecution and the defense, the jury was instructed in the language of CALJIC No.

2.50 (1979 rev.) that the other-crimes evidence received at trial could not be considered to prove that defendant was a person of bad character or that he had a disposition to commit crimes. The instruction did not, however, list the purposes for which the jury could properly consider the evidence. Defendant contends that this failure was prejudicial error, but he does not explain specifically how the jury might have misused the evidence. We agree that additional guidance concerning the proper use of the evidence would have been beneficial but, given the broad purposes for which the evidence was properly received, we fail to perceive any significant risk of prejudice. Had a more complete instruction been given, an outcome more favorable to defendant is not reasonably probable.

## B. *Adoptive Admissions.*

 Defendant objected at trial on hearsay and relevance grounds to the entire testimony of Phil Green concerning his conversation with defendant on or about December 14, 1981. Based on an offer of proof, the court overruled the objection, ruling that evidence of the conversation was relevant and, although hearsay, was admissible under the adoptive admission exception to the hearsay rule (Evid. Code, § 1221). The court stated its ruling was without prejudice to further objections during the witness's testimony. Phil Green then gave the testimony reproduced in the margin.[10]

---

[10] "MR. JONES [the prosecutor]: Q What did you talk to him about?

"A I stated that I really wanted to have a good talk with him because I didn't feel like I was very supportive to him over the past year for my own personal feelings, due to the fact that one of my guns were [*sic*] missing from my residence and it just—

"MR. CARTER [defense counsel]: I'm going to—I'm going to—if this is what he said, I have no objection.

"THE WITNESS: This is sort of paraphrasing. I can't really remember precise words. I'm sorry.

"THE COURT: Tell us substantially, to the best of your recollection, what you said to Mr. Edelbacher and what he said to you.

"THE WITNESS: Okay. Basically, I said there's only three possible people that could—that knew where my guns—that I even had guns. And two of the other parties were totally outruled, you know. They wouldn't have anything to do with it. And I pointed that that pointed he was the only party who possibly knew where my other guns were. Being that and the circumstances involved with Lela's death, I just felt like he was part of it, and—. . . .

"This is what I was telling him. I couldn't believe what could ever drive a person to react so violently such as killing a person. I just couldn't handle that. And he responded in saying that, well, Lela knew something was going to happen. Lela was aware of something that might happen basically. And I—at that point, I cut him off . . . . I said I didn't want to hear anything about it. I didn't want him to tell me anything about it so he didn't say anything after that. And I went on and told him how mad I was and hurt I was about his abuse in our relationship about the trust that friends are supposed to have. And he used me and it really hurt me a whole lot. I couldn't handle that. And then I said, 'we just better go.' So, we were driving out at that time. When we were trying to make the U-turn on Fresno Street on going back to my house on Shaw he said, 'God, I wish they'd just throw me in jail. I wish this whole thing was over with.'

During cross-examination, defense counsel asked whether the witness had given defendant an opportunity to respond to the accusations against him. The pertinent portion of this testimony is also reproduced in the margin.[11]

As this court stated in *People* v. *Preston* (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300]: "If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." (See also, *People* v. *Simmons* (1946) 28 Cal.2d 699, 712-713 [172 P.2d 18].)

Defendant contends that Phil Green's testimony did not meet the requirements of the adoptive admissions exception because Green's statements to defendant were ambiguous and not clearly accusatory, and because Green expressly told defendant not to respond. We are not persuaded.

To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide. (*People* v. *Richards* (1976) 17 Cal.3d 614, 618 [131 Cal.Rptr. 537, 552 P.2d 97].)

Phil Green's statements linked the theft of Green's shotgun to defendant and to Lela's death. In context it was apparent that Green was

---

"I looked at him and I said, 'I really don't believe you mean that.' And he says, 'Well, I have always been having trouble with meeting women like Lela and Signe.' And I said, 'Well, I don't think that that is your problem, I think it's just women in general is your problem.' Then he—I said, 'I hope you're being able to talk to somebody truthfully and getting this out and getting help with this' and he said, 'Yes.' . . .

"Okay. So, I was satisfied. And there was silence until we were almost home. Anyway, and we drove up at the house and I restated why or how I felt used and abused and in our relationship, our friendship and I said 'I just didn't want to see him anymore.' This was pretty emotional, we were both pretty drained and he just goes, 'I'm really sorry.' And that was about it."

[11] "Q And Peter tried to respond to your statement, and you cut him off, didn't you?

"A He wasn't responding in—in any type of denial fashion in any way.

"Q Yeah, but he started to say something to you—

"MR. JONES: Your Honor, can the witness finish his answer, Your Honor?

"THE COURT: I think he has finished. Do you have some additional?

"THE WITNESS: No. His tone of voice, the way he acted was more in an explanatory fashion."

accusing defendant of stealing Green's shotgun and using it to kill Lela. Green's statement that he could not understand why one person would kill another invited defendant to comment on the accusation. The jury could reasonably view defendant's response, that Lela knew something would happen, as demonstrating that defendant understood the accusation.

Phil Green cut defendant off only after defendant made this remark that Lela knew something would happen. Defendant's statement attempted to shift blame onto the victim, apparently referring to defendant's threat to blow Lela's head off if she "went through with it." The statement could reasonably be viewed as an acquiescence in the truth of the accusation, reflecting consciousness of guilt. Under these circumstances defendant would have understood Green's statement cutting defendant off to mean that Green did not want to hear the reasons why defendant had killed Lela. Defendant did make further remarks, including the statement he wished "the whole thing was over with." Had defendant intended to make a denial, the jury could reasonably find he had ample opportunity to do so. Phil Green's testimony was properly admitted under the adoptive admission exception to the hearsay rule.

C. *Prior Consistent Statements.*

Defendant's next contention is error in the admission of prosecution evidence under the prior consistent statement exception to the hearsay rule.

Testifying during the prosecution's case-in-chief, McClure's former husband Michael stated that his marriage to McClure had been dissolved in 1980 and that custody of their one child had been awarded to McClure. Defendant had telephoned Michael on the morning of January 4, 1982, and had arranged a meeting for that afternoon at a restaurant in Fresno to discuss Michael's continuing dispute with McClure over custody of their son.

During the meeting, according to Michael's testimony, defendant said he had been through a divorce recently and there had been a spousal rape case which Michael might have read about in the paper. Defendant said he had been cleared and shortly afterwards his wife had been killed. Michael expressed sympathy but defendant said, "Well, really it worked out good for me because I don't have any child support payments now and I have custody of my son." Defendant said, "the same thing could happen for you" and "I know some people that could take care of the problem for you, or I could." Defendant continued, "If she wasn't around, you wouldn't have any child support and you would have custody of your son." Michael changed the subject and left shortly thereafter.

During cross-examination Michael stated he had received immunity for his testimony and was accompanied in court by his attorney. Defense counsel asked whether Michael had reported the conversation to McClure and Michael replied that he had not because they were not on speaking terms at that time. Defense counsel also asked Michael when he became aware that defendant was suspected of killing Lela.

Defendant testified that it was Michael who had proposed the meeting and had suggested that defendant could arrange for something to happen to McClure similar to what had happened to Lela. Defendant said he became angry at the insinuation that he had killed Lela and he immediately terminated the discussion.

Defendant moved to exclude proposed rebuttal testimony of Michael's father. Based on an offer of proof, the court denied the motion, finding that the proposed testimony was admissible under the prior consistent statement exception to the hearsay rule. Thereafter Michael's father testified, in accordance with the offer of proof, that he had accompanied Michael to the restaurant where Michael met defendant. Michael's father sat apart and did not overhear any of the conversation between Michael and defendant but immediately afterwards Michael had stated: "Dad, this guy is crazy. We better get out of here. The way he wanted me—the way I could get custody of my son is to have—have a hit man wipe out his mother."

■■■ An out-of-court statement by a witness is not barred by the hearsay rule if the statement is consistent with the witness's testimony and is offered after an express or implied charge that the testimony has been recently fabricated or influenced by bias or other improper motive and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen. (Evid. Code, §§ 791, 1236.) Defendant concedes that Michael's out-of-court statement, as reported by Michael's father, was consistent with Michael's testimony and that there was an express or implied charge that Michael's testimony was fabricated and influenced by bias and other improper motives. But defendant maintains that the prior statement was inadmissible because there was no evidence that the improper motive or intent to fabricate arose after the prior statement.

The cross-examination concerning Michael's failure to warn his former wife provided a sufficient basis for admissibility as a prior consistent statement. Where cross-examination concerning failure to report an incident implies a later fabrication, evidence that the incident was reported shortly after its occurrence is admissible. (See *People* v. *Welch* (1972) 8 Cal.3d 106, 116 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Gentry* (1969) 270

Cal.App.2d 462, 473 [76 Cal.Rptr. 336].) The trial court did not err in admitting as prior consistent statements the testimony of Michael's father.

D. *Instruction on Reliability of Jailhouse Informant.*

 Defendant contends that the trial court erred in failing to instruct the jury sua sponte that the testimony of jailhouse informants should be viewed with caution and distrust. The contention is without merit; as we have recently held, a trial judge has no duty to give sua sponte cautionary instructions regarding an informant's testimony. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 566 [244 Cal.Rptr. 121, 749 P.2d 776].)

E. *Shoeprint Evidence.*

After investigating the scene of Lela's shooting, Deputy Sheriff Johansen went to defendant's residence in Madera, arriving approximately 3:30 a.m. Finding no one at home, he parked nearby and watched the residence for about five hours. From that location Johansen went to the residence of defendant's parents, also in Madera. Defendant's parents were at home and spoke to the officers. As he was about to enter his own vehicle, intending to leave, Johansen noticed some shoeprints which appeared similar to those found at the murder scene. The officer followed the shoeprints back to the driver's side of a pickup parked in the driveway. Defendant's mother told the officer that defendant was the last person to drive that truck. Johansen arranged to have these prints photographed by a criminalist. He also arranged for photographs to be taken at about the same time of similar shoe tracks at defendant's residence in the front yard and on the front porch.

A criminalist testifying for the prosecution concerning the tracks found at the three locations could only say that they exhibited a similar sole pattern. Because they were all partial prints, the length and width of the prints could not be measured to determine shoe size, nor were any distinctive wear characteristics discernible. Thus the witness was unable to determine whether any of the various tracks had been made by the same shoe, shoes of the same size, or even shoes from the same manufacturer. In closing argument the prosecutor disavowed reliance on the shoe track evidence to establish defendant's guilt.

Defendant maintains that the shoe track evidence obtained at the residences of defendant and his parents was illegally seized and therefore inadmissible. He also maintains that the evidence was lacking in relevance and that any relevance it may have had was outweighed by the risk of prejudice and on this basis it should have been excluded.

*Search and seizure.* Defendant did not bring a pretrial motion to suppress the shoe track evidence under section 1538.5, nor did he challenge the evidence at trial on search and seizure grounds. He nevertheless maintains that the issue is reviewable because failure to seek exclusion of this evidence on Fourth Amendment grounds constituted ineffective assistance of counsel. We conclude there was no Fourth Amendment violation.

■■■■ An officer's observation with the naked eye from a vantage point open to the public is ordinarily not regarded as a search within the meaning of the constitutional proscription against warrantless searches. (*People* v. *Cook* (1985) 41 Cal.3d 373, 380 [221 Cal.Rptr. 499, 710 P.2d 299]; *People* v. *Mack* (1980) 27 Cal.3d 145, 150 [165 Cal.Rptr. 113, 611 P.2d 454].) In determining whether a warrantless government surveillance is proscribed by the Fourth Amendment, the inquiry is "whether the government intruded unreasonably on an expectation of privacy which society is prepared to recognize as valid." (*Cook, supra,* at p. 379; see also, *In re Deborah C.* (1981) 30 Cal.3d 125, 135 [177 Cal.Rptr. 852, 635 P.2d 446].) The determining factor is whether common habits in the use of property result in a reasonable expectation of privacy in a given situation. (*Cook, supra,* at p. 381, fn. 3; *In re Deborah C., supra,* at p. 137.) "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (*Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507].)

Here the evidence in question was observed by Officer Johansen while he was looking for defendant at the residences of defendant and his parents. The tracks were outside in the front porch, driveway, and front yard portions of the residences. The tracks were apparently visible on the normal route used by visitors approaching the front doors of the residences and there is no indication of solid fencing or visible efforts to establish a zone of privacy. Accordingly, observing and photographing the shoe tracks did not violate the Fourth Amendment.

■■■■ *Relevance.* Defendant contends that evidence of the shoe tracks should have been stricken as irrelevant because, though it might engender speculation, the evidence would not support a reasonable inference as to any fact at issue. A motion to strike the evidence was made at trial on the ground there was "insufficient foundation to show that they in any way relate to" defendant.

Defendant's objection goes to weight rather than admissibility. (See *People* v. *Cordova* (1979) 97 Cal.App.3d 665, 669 [158 Cal.Rptr. 852].) Relevant evidence is evidence having *any* tendency in reason to prove or disprove a disputed fact properly at issue. (Evid. Code, § 210; *People* v. *Bur-*

*gener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].) Evidence that shoe tracks at defendant's residence and leading to a vehicle last driven by defendant were consistent with those found at the murder scene had some tendency in reason to establish that defendant was at the murder scene and fired the fatal shot. The trial court did not err in overruling defendant's objection on grounds of relevance.

*Evidence Code section 352 motion.* Defendant argues that the shoe track evidence should have been excluded under Evidence Code section 352 because its probative value was exceeded by the risk of undue prejudice. He further argues that the trial court erred in failing to state on the record that it had weighed prejudice against probative value.

As stated, defense counsel's motion to strike the shoe track evidence was on the ground of lack of foundation. In opposing the motion the prosecutor characterized the issue as one of relevancy and stated that the evidence was relevant and the proper weight was for the jury to determine. Defense counsel did not dispute this characterization of the motion but in argument he did refer twice to the evidence being prejudicial and its probative value being slight. However, the only claimed prejudice was the inducement to the jury to speculate that the prints were made by the same shoes and that the shoes had been worn by defendant. The trial court stated that the evidence was relevant and could even be to defendant's advantage in that defendant's sister-in-law had testified defendant had been wearing shoes with a different sole pattern on the night of Lela's death. The trial court denied the motion to strike without further elaboration.

To the extent that defendant's motion to strike may be regarded as a motion under Evidence Code section 352, it was properly denied. There was little risk of prejudice from the shoe track evidence. The evidence was not of a kind likely to engender sympathy for the victim, to connect defendant with uncharged crimes, to arouse the emotions of the jurors, or to be used in some manner unrelated to the issue on which it was admissible. Defendant's argument that the expert testimony tended to give the evidence an artificial aura of reliability is unpersuasive. The expert witness did not claim to have discovered anything other than what the jurors could see for themselves by examining the photographs—i.e., that there was a similarity in the sole patterns. In short, defendant has failed to demonstrate any significant risk of prejudice.

When an objection is raised under Evidence Code section 352, the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value. (*People* v. *Wright* (1985) 39 Cal.3d 576, 582 [217 Cal.Rptr. 212, 703 P.2d 1106]; *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164

Cal.Rptr. 1, 609 P.2d 468].) Here the trial court permitted counsel to argue the motion to strike at length. Counsel's argument as to both probative value and prejudice focused on what he characterized as the speculative nature of the evidence. No other risk of prejudice was suggested. The record, including the court's comments, sufficiently establishes that the court weighed and rejected the arguments of defense counsel.

### F. Third-party Culpability Evidence.

Defendant contends that the trial court erred in excluding evidence that Lela's murder was committed by someone other than defendant.

In *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], we disapproved language in *People* v. *Arline* (1970) 13 Cal.App.3d 200 [91 Cal.Rptr. 520], establishing a distinct and elevated standard for admissibility of defense evidence tending to show a third party's guilt of the charged offense. We held that "the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Hall, supra,* at p. 833.)

Our holding did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.) We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352. (*Id.* at pp. 833-835.)

As an offer of proof, defendant's mother testified outside the jury's presence that her daughter had worked with Lela at a fast-food outlet, that on the morning following Lela's death this daughter told her that Lela had asked the daughter several times if she knew anyone who wanted to buy some marijuana. Defendant's mother testified further that during the spousal rape trial an unidentified friend had told her that Lela's mother "had been unhappy that her daughter had been running around with some Hell's Angel-type people." The evidence was not offered to prove third-party guilt at that time and was ruled inadmissible. Defense counsel subsequently urged the court to admit the testimony "to show by circumstantial evidence the possible motive of third parties to commit the crime and circumstantial evidence as to possible identity of third parties to commit the crime." Counsel argued that "people who are dealing in narcotics frequently end up

injured or shot." The court reaffirmed its ruling excluding the testimony in question of defendant's mother. Defense counsel stated "there are other witnesses that could testify substantially the same thing, plus their direct knowledge of the dealing in drugs by Lela." The court stated it would sustain an objection to such evidence "[i]f that's all the evidence consists of."

 The court's ruling was correct. Quite apart from the obvious hearsay problems, defendant's proposed evidence did not identify a possible suspect other than defendant or link any third person to the commission of the crime. The evidence did not even establish an actual motive but only a possible or potential motive for Lela's murder. As we stated in *Hall, supra,* 41 Cal.3d 826, evidence of a third party's motive, without more, is inadmissible. A fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible.

*Prosecutorial misconduct.* Despite the court's ruling, defendant was able to introduce evidence that Lela had sold drugs and had unsavory acquaintances. During the tape-recorded jailhouse conversation, defendant and his brother Chris briefly discussed Lela's drug sales. Chris said their mother wanted to find out who Lela had been dealing with. Defendant said Lela "did a little on some of her friends, but I don't think that's going to be that important right now." During his trial testimony, defendant said he had received information that Lela "was running with a pretty rough crowd" which included "bikers" and "dope dealers" described as having long hair and tattoos "all up and down their arms." This evidence was admitted only for its bearing on defendant's state of mind and to explain defendant's remark to Phil Green that Lela knew something was going to happen.

Defendant maintains that the following statements by the prosecutor during rebuttal argument constituted misconduct: "Law enforcement honed in on the defendant on April the 4th, 1981. They honed in on him. I don't know. Maybe he wanted us to hone in on the bikers, the bikers that come from fifth-generation hearsay. What bikers are there? No bikers came into this court. There is no bikers' evidence. His mother heard it from fifth-hand hearsay, and his sister saw somebody at a Jack-in-the-Box that she heard. There is no biker evidence in this case. All of the evidence does hone in on the defendant."

Had the court improperly excluded third-party guilt evidence, the prosecutor's comment would have increased the risk of prejudice but there was, as stated, no improper exclusion of evidence. Given the absence of any admissible evidence of third-party culpability, and the possible implication

of such culpability arising from the jailhouse tape and from defendant's testimony, the argument was permissible to dispel any impression that third-party guilt was an issue in the case.

G. *Sufficiency of Evidence for Murder Verdict.*

 Defendant contends there is insufficient evidence to support his conviction of first degree murder. In particular, he contends there was insufficient evidence to establish that he was the perpetrator of the crime.

 A challenge to the sufficiency of the evidence requires us to determine, after review of the whole record, whether the evidence is such that a reasonable trier of fact could have found beyond a reasonable doubt that defendant was the perpetrator of the charged crime. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 346 [233 Cal.Rptr. 368, 729 P.2d 802].) In making this determination we must view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Id.* at pp. 346-347.)

 The prosecution presented evidence that defendant had threatened to kill Lela and had several reasons for desiring her death. After defendant's car was repossessed, a shotgun which could have been the murder weapon was removed from the vehicle and returned to defendant, less than two weeks before Lela was killed. Although his residence was in Madera, defendant was admittedly in Fresno, in the vicinity of the shooting, at the time of the crime. Defendant later told McClure he could still see Lela walking across the bedroom on the night she was killed and that Lela had been killed with Phil Green's shotgun. Defendant later entered McClure's residence and threatened her with a shotgun, saying she knew too much. When told by Phil Green that Green suspected him of stealing Green's shotgun and using it to kill Lela, defendant replied only that Lela knew something could happen and, later, that he wished they would just throw him in jail. Finally, defendant solicited his brother to kill McClure to prevent her from testifying against him for the murder of Lela. This evidence was amply sufficient to establish defendant as Lela's murderer.

H. *Lying in Wait as an Element of First Degree Murder.*

Defendant contends that the verdict of first degree lying-in-wait murder is not supported by substantial evidence that the shooting of Lela was preceded by a period of waiting, watching, and concealment; he also contends that CALJIC No. 8.25, as given in this case, incorrectly defines lying in wait as an element of first degree murder.

*Sufficiency of the evidence.* Defendant argues that the prosecution was forced to rely on the jailhouse tape to establish lying in wait and that the tape did not provide substantial evidence of lying in wait. We have previously concluded that the tape was relevant and admissible to prove lying in wait; it was not, however, the only evidence on that issue. ▮▮▮ As we shall see, there was substantial evidence of lying in wait apart from the jailhouse tape.

In *People* v. *Harrison* (1963) 59 Cal.2d 622 [30 Cal.Rptr. 841, 381 P.2d 665], the victim was assaulted and killed as she left her apartment during the evening in the company of another woman. As here, the defendant contended there was insufficient evidence to establish lying in wait. We rejected the contention, stating: "From the evidence that defendant had armed himself with a butcher knife, that he was not observed on the street prior to the attack, and that he attacked Mrs. Martin [the victim] immediately upon her emergence from the apartment house, the jury could reasonably conclude that he was waiting for her with the intention of killing or inflicting injury upon her, and that the killing was accomplished by the means of his watching and waiting in concealment." (*People* v. *Harrison, supra,* at p. 631; see also, *People* v. *Atchley* (1959) 53 Cal.2d 160, 176 [346 P.2d 764].)

In the present case, similarly, there was evidence that defendant armed himself with a shotgun, was not observed on the street either before or after the shooting, and shot Lela from a concealed position almost immediately after she returned home. As in *Harrison,* the jury could reasonably conclude from this evidence that the killing was preceded by a period of watchful waiting and therefore was accomplished by means of lying in wait.

Defendant insists that Lela was not shot immediately after she returned home or immediately after she entered her bedroom and that the substantial interval of time which elapsed precludes an inference of lying in wait. In making this argument defendant relies on the testimony of Lela's mother, who stated that "it couldn't have been more than 12 minutes" from the time Lela began to walk toward her bedroom until the shotgun was fired.

However, other substantial evidence in the case supports a reasonable inference that the shot was fired very soon after Lela entered her bedroom. Lela had been watching a television show at a friend's apartment and departed after the program ended at 11 p.m. Lela's parents had been watching the same program and Lela's father went to bed after its end while her mother stayed up to watch the news. When Lela arrived home, her father had already retired. After exchanging a few words with her mother, Lela proceeded to her bedroom. Lela's mother responded to the noise of the

shotgun by looking out the family room window, conferring with her husband in the hallway, and looking out the kitchen window (she saw no one from either window). She and her husband then called to Lela and knocked at her door before entering. They found Lela on the floor, dressed in a bra and pajama pants. The pajama top was on the bed. Lela's parents did not immediately comprehend what had happened and more time passed before they realized that Lela had been shot and was gravely wounded. They went to telephone for help. Not remembering the number to call, they called the operator who connected them with the sheriff's office. Deputy Sheriff Edward Mee testified that he was dispatched to the residence at 11:08 or 11:09 p.m.

The brief interval of time which appears to have elapsed between Lela's entry into her bedroom and the firing of the fatal shotgun did not make a finding of lying in wait unreasonable since a person concealed in ambush would wait for a clear shot at the intended victim. The evidence is sufficient to establish lying-in-wait murder.

*CALJIC No. 8.25.* The term "lying in wait" was defined for the jury in the language of CALJIC No. 8.25, as follows: "The term, 'lying in wait,' is defined as waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation *or* deliberation." (Italics added.)

Defendant argues that the instruction's use of the disjunctive "or" (italicized above) is incorrect and that the duration of the lying in wait must be sufficient to show a state of mind equivalent to both premeditation *and* deliberation. We rejected the same contention in *People* v. *Ruiz* (1988) 44 Cal.3d 589, 614-615 [244 Cal.Rptr. 200, 749 P.2d 854], concluding that the instruction's disjunctive phraseology is neither inappropriate nor misleading.

I. *Lying-in-wait Special Circumstance.*

Defendant urges reversal of the lying-in-wait special circumstance on the following grounds: (1) the jury instructions failed to explain how the lying-in-wait special circumstance differs from lying in wait as a basis for first degree murder; (2) there was no substantial evidence to support the lying-in-wait special circumstance; (3) the corpus delicti requirement applies to the lying-in-wait special circumstance and was not satisfied; and (4) the lying-in-wait special circumstance fails to provide a meaningful basis for

imposition of the death penalty and thus violates the Eighth Amendment of the federal Constitution.

*Instructions.* Lying in wait constitutes a special circumstance under the 1978 death penalty law where "[t]he defendant intentionally killed the victim *while* lying in wait." (§ 190.2, subd. (a)(15), italics added.) Lying in wait provides a basis for a first degree murder conviction where the murder "is perpetrated *by means of* . . . lying in wait . . . ." (§ 189, italics added.) In *Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486], the court concluded that the category of murders committed "while" lying in wait is narrower than the category of murders committed "by means of" lying in wait, and that the lying-in-wait special circumstance requires that the killing "take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends." (*Domino* v. *Superior Court, supra,* at p. 1011.) Relying on *Domino,* defendant contends that the jury instructions given in this case on the lying-in-wait special circumstance were defective because they merely incorporated by reference the CALJIC No. 8.25 definition of lying-in-wait murder.

We need not decide in this case whether the distinction drawn in *Domino* is correct. There was no evidence that Lela's murder was committed some time after rather than during the lying in wait and thus no rational juror could conclude, under any reasonable construction of the statutory language, that defendant committed the murder "by means of" lying in wait but not "while" lying in wait. The fatal shot was fired through a window from outside the victim's residence, the victim was obviously taken unawares, and the shooter was not observed either before or after the shooting. The distinction drawn by *Domino* simply has no relevance to the facts of this case and an instruction explaining the distinction could not have resulted in a verdict more favorable to defendant.

*Sufficiency of the evidence.* Defendant's argument that the evidence was insufficient to support the lying-in-wait special circumstance incorporates by reference the arguments made against the sufficiency of the evidence to support the verdict of first degree murder. For the reasons already stated, we reject these arguments in this context as well.

*Corpus delecti.* Defendant contends that the corpus delicti requirement (i.e., the elements of a criminal offense must be established independently of the accused's extrajudicial statements, confessions, or admissions) applies to the lying-in-wait special circumstance and was not satisfied here. Defendant asserts that the prosecution relied exclusively on the jailhouse tape to prove lying in wait.

The contention fails on two grounds. As noted above, the lying-in-wait special circumstance was proved by substantial evidence apart from the jailhouse tape or any statements of defendant. Also, we have recently concluded that the holding of *People* v. *Mattson* (1984) 37 Cal.3d 85, 94 [207 Cal.Rptr. 278, 688 P.2d 887], applying the corpus delicti rule to felony-based special circumstances, should not be extended to special circumstances not so based. (*People* v. *Howard* (1988) 44 Cal.3d 375, 415 [243 Cal.Rptr. 842, 749 P.2d 279].)

*Constitutionality.* To avoid the Eighth Amendment's proscription against cruel and unusual punishment, a death penalty law must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." (*Furman* v. *Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (conc. opn. of White, J.); accord, *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759] (plur. opn.).) Defendant maintains that the lying-in-wait special circumstance, if it applies to the facts of this case, does not provide a meaningful basis for narrowing the class of murders for which death may be imposed.[12]

Murder committed by lying in wait has been "anciently regarded . . . as a particularly heinous and repugnant crime." (Note, *Murder Committed by Lying in Wait* (1954) 42 Cal.L.Rev. 337.) The lying-in-wait special circumstance also requires that the murder be intentional, thus eliminating murders where only implied malice has been established. (See *People* v. *Mattison* (1971) 4 Cal.3d 177, 182-183 [93 Cal.Rptr. 185, 481 P.2d 193].) We are satisfied that the lying-in-wait special circumstance provides a "principled way to distinguish this case" from other first degree murders and thus comports with the Eighth Amendment requirements elucidated in *Godfrey* v. *Georgia, supra,* 446 U.S. 420. (See *Proffitt* v. *Florida* (1976) 428 U.S. 242, 255-256 [49 L.Ed.2d 913, 924-925, 96 S.Ct. 2960]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 780-781 [230 Cal.Rptr. 667, 726 P.2d 113].)

J. *Admissibility of Evidence of Defendant's Debts.*

 The prosecution introduced evidence of defendant's precarious financial position at the time of Lela's death to establish defendant's motive for killing her and in proof of the financial-gain special circumstance. In this

---

[12] We do not understand defendant to contend that the lying-in-wait special circumstance is constitutionally infirm because it duplicates an element of first degree murder. As defendant no doubt recognizes, a contention to this effect would be meritless. (*Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 579, 108 S.Ct. 546].)

section we consider defendant's contention that evidence of his various debts was inadmissible for any purpose and that his trial counsel's failure to object constituted ineffective representation. In the next section we consider other contentions relating to the financial-gain special circumstance.

Evidence of a defendant's poverty or indebtedness, without more, is inadmissible to establish motive for robbery or theft because it is unfair to make poverty alone a ground of suspicion and the probative value of the evidence is deemed to be outweighed by the risk of prejudice. (*People* v. *Hogan* (1982) 31 Cal.3d 815, 854 [183 Cal.Rptr. 817, 647 P.2d 93].) Evidence of poverty or indebtedness is admissible, however, in a variety of circumstances, such as to refute a defendant's claim that he did not commit the robbery because he did not need the money (*People* v. *Gorgol* (1953) 122 Cal.App.2d 281, 303 [265 P.2d 69]), or to eliminate other possible explanations for a defendant's sudden wealth after a theft offense (*People* v. *Hogan, supra,* at p. 854; *People* v. *Orloff* (1944) 65 Cal.App.2d 614, 620 [151 P.2d 288]). (See generally, 2 Wigmore, Evidence (Chadbourn rev. 1979) § 392, pp. 430-433.)

Defendant in the present case owed Lela approximately $700 in child support arrearages and over $48,000 to equalize a community property division. The latter obligation was due on April 18, 1981. It was the prosecution's position, explained at greater length in the next section, that defendant profited uniquely from Lela's death. Once the debtor-creditor relationship had been established between defendant and the victim, evidence that defendant had a number of other debts, some of which were in arrears, had substantial relevance to show the motive for the murder of defendant's creditor, and this relevance clearly outweighed the risk of undue prejudice. The evidence was admissible and counsel's failure to object did not demonstrate incompetence.

K. *Financial-gain Special Circumstances.*

Under the 1978 law, the death penalty may be imposed if "[t]he murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) Defendant contends that this special circumstance cannot be construed to apply to the facts of this case without making it unconstitutionally vague and overbroad (both as failing to provide fair warning of the conduct prohibited and as failing to provide a meaningful basis for selecting death-eligible defendants), that the instructions regarding this special circumstance were inadequate, and that there was insufficient evidence to support a finding of murder for financial gain.

*Interpretation.* In *People* v. *Bigelow, supra,* 37 Cal.3d 731, the prosecution's evidence indicated that the defendant had killed the victim after

kidnapping and robbing him. Construing the financial-gain special circumstance as applying to this situation would have created a large area of overlap between this special circumstance and that of felony murder, with a resulting risk of prejudice to the defendant. Eliminating the overlap would not prejudice the prosecution, we reasoned, because there would remain at least one special circumstance—either financial gain or felony murder—applicable in virtually all cases of murder to obtain money or other property. Accordingly, we adopted a limiting construction "under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Bigelow, supra,* at p. 751; see also, *People* v. *Montiel* (1985) 39 Cal.3d 910, 927 [218 Cal.Rptr. 572, 705 P.2d 1248].)

Defendant argues, first, that the financial-gain special circumstance should not be construed to apply to "every murder where there is any possibility of a financial effect upon a defendant" and, in particular, that it cannot apply to the facts of this case because after Lela's death all debts owed to her would become assets of her estate and enforceable by the executor or administrator. Defendant maintains that Lela's death did not result directly in any financial benefit to him.

Proof of actual pecuniary benefit to the defendant from the victim's death is neither necessary nor sufficient to establish the financial-gain special circumstance. As we recently explained, "the relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain." (*People* v. *Howard, supra,* 44 Cal.3d at p. 409.) As so construed, the special circumstance provision is not constitutionally vague or overbroad. It has been widely recognized that murder for financial gain is an especially vile crime for which the death penalty may appropriately be imposed. (See, e.g., Model Pen. Code & Commentaries (part II, vol. 1) § 210.6, pp. 109-110.)

Defendant argues, next, that the term "gain" means a profit or increase and does not include the mere avoidance or cancellation of a financial obligation. The proposed construction is artificially restrictive and does not accord with the ordinary meaning of the statutory term. In common usage, the cancellation of a debt or the avoidance of a loss constitutes a financial benefit or gain. The construction urged by defendant would result in an arbitrary and irrational distinction, moreover, since a killing to avoid a loss is as basely motivated and repugnant as a killing for a positive reward or profit. We conclude that a murder for the purpose of avoiding a debt is a murder for financial gain within the meaning of section 190.2, subdivision (a)(1).

*Sufficiency of the evidence.* ▇▇▇ There was substantial evidence that defendant was motivated by a belief that Lela's death would permit him to avoid his obligations to her.

It was undisputed that at the time of Lela's death defendant was $700 in arrears in payments for child support and owed Lela over $48,000 to equalize the division of community property. Defendant's inability to meet these obligations was shown circumstantially by evidence of numerous other debts owed by defendant, some of which were in arrears, and evidence that one of defendant's automobiles was repossessed shortly before the murder. While it is true that the obligations owed to Lela would not be extinguished by her death and would be enforceable by her estate, there was also evidence that defendant believed he would benefit financially from her death. Defendant's son was Lela's heir and defendant expected to and did gain custody of his son after Lela's death. Defendant applied for appointment as guardian of the person and estate of his son. Had defendant been appointed guardian of his son's estate he would have obtained control of his son's inheritance from Lela's estate.

During defendant's conversation with Phil Green, as related by defendant to McClure (and as testified to by McClure at trial), Green said he did not understand why defendant had to kill Lela because there should have been some way to work out their son's custody "and paying off the half of his [defendant's] estate to Lela." Defendant did not deny that these were motivating considerations and later during the same conversation with McClure he told her he was going to try to "work out some papers" with his son's name on them "so that he [defendant] wouldn't lose the ranch completely." When defendant spoke to McClure's husband Michael about Lela's death, defendant said, "Well, really it worked out good for me because I don't have any child support payments now and I have custody of my son." Defendant said the "same thing" could happen for Michael and, in discussing the possible benefits for Michael if McClure died, he referred to McClure's "sizable bank account," the inference being that McClure's death would somehow provide Michael with access to McClure's assets, presumably through custody of their child. This evidence was sufficient to support the finding that financial gain was a primary motive for the murder of Lela by defendant.

*Instructions.* The jury was instructed in the language of CALJIC No. 8.81.1 as follows: "To find that the special circumstance, referred to in these instructions as murder for financial gain, is true, each of the following facts must be proved: [¶] 1. That the murder was intentional, and [¶] 2. That it was carried out for financial gain."

Defendant contends this instruction was inadequate because it failed to define "financial gain" and failed to explain that "for" connotes a motivation or an intention. The contention is without merit. As we recently held, the term "for financial gain" is not a technical one and need not be defined for the jury except in the situation where there is potential overlap with a felony-murder special circumstance. (*People* v. *Howard, supra,* 44 Cal.3d at p. 410.) For similar reasons, we are not persuaded the jury was likely confused by another instruction, CALJIC No. 2.51, stating that "Motive is not an element of the crime charged." The "crime charged" was murder and any reasonable juror would have understood the instruction as referring to this substantive offense only and not to any special circumstance allegation.

## L. *Witness-retaliation Special Circumstance.*

Another special circumstance under the 1978 death penalty law is that ". . . the victim was a witness to a crime and was intentionally killed in retaliation for his testimony in any criminal proceeding." (§ 190.2, subd. (a)(10).) The information charged defendant with this special circumstance as follows: ". . . the murder of said Lela Schwartz was murder in the First Degree and said Lela Schwartz was a witness to a crime and was intentionally killed in retaliation for her testimony in a criminal proceeding." At trial defendant moved to dismiss this special circumstance on the ground that Lela had been a witness only in defendant's trial on the charge of spousal rape and defendant's acquittal established there had been no crime for Lela to witness. Without expressly ruling on the motion, the trial court amended the information to charge that Lela had been a witness to "an alleged crime." The jury found this special circumstance not true.

 Defendant contends that the court erred in denying the motion to dismiss the special circumstance and that he was prejudiced by the erroneous ruling because it permitted the introduction of highly prejudicial evidence regarding the spousal rape allegation and trial. Because this evidence was otherwise admissible to establish motive and to explain defendant's threat to kill Lela, defendant has demonstrated no prejudice and we need not decide whether the witness-retaliation special circumstance was properly charged or whether any error was waived.

A witness testified that on May 31, 1980, defendant told Lela that "if she went through with this he would blow her fucking head off." Other witnesses established that Lela's petition for dissolution of marriage had been filed on May 21, 1980, and that defendant had been arrested on May 28, 1980, on the charge of spousal rape, so that defendant's threat could have related to the dissolution proceeding, the spousal rape charge, or both.

Defendant concedes that evidence of the spousal rape charge and trial may have been relevant to establish motive but he argues it would have been inadmissible under Evidence Code section 352 because the probative value was clearly outweighed by the risk of undue prejudice. We disagree. The evidence was highly relevant on the issue of motive, which was an important issue in the case, and the risk of prejudice was not excessive. No evidence regarding the circumstances of the alleged spousal rape was admitted, only the fact that the charge had been brought and tried and that defendant had been acquitted. Defendant was not prejudiced by the charging of the witness-retaliation special circumstance.

## M. *Failure to Instruct on Second Degree Murder.*

 Defendant contends that the trial court erred in refusing to give the instructions he requested on second degree murder, a lesser included offense of first degree murder. We need not decide whether the failure to give these instructions as requested was error; any error was necessarily harmless in light of the true finding on the lying-in-wait special circumstance.

"[I]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; see also, *People* v. *Wickersham* (1982) 32 Cal.3d 307, 335 [185 Cal.Rptr. 436, 650 P.2d 311].)

Defendant argues that a jury instructed on second degree murder might have convicted him of that offense because it was not convinced beyond a reasonable doubt that the murder was committed intentionally and after premeditation and deliberation. According to defendant, the jury might have concluded that he entertained only implied malice, that he acted on impulse, or both. In returning a true finding on the lying-in-wait special circumstance, however, the jury expressly found, on proper instructions, that the murder was intentional and was committed while lying in wait. (The finding on the financial-gain special circumstance also established that the murder was intentional.) Thus the jury found that the murder was

committed with express malice and in a manner which, by force of statute, elevated it to first degree murder.

### N. *Comment on Defendant's Pretrial Silence.*

On the night following Lela's murder, sheriff's deputies found defendant at the residence of Sheila Butler. They handcuffed defendant and seized some clothing which, according to Butler, defendant had been wearing when he first arrived at the apartment. Defendant informed the officers he had been in touch with his attorney and the attorney wanted to be present during any questioning. The officers released defendant from the handcuffs and departed.

At trial, on direct examination defendant testified that he had been with Carol Leos on the evening of Lela's murder and that on the following morning he was advised by his attorney not to discuss the case with anyone. During cross-examination, defendant testified without objection that he did not mention the Leos alibi to his attorney or to Sheila Butler before the officers' arrival. Later defendant was asked whether, after the officers hand-cuffed him, he felt it was time to tell them about his activities on the day before. Defendant replied, after an objection by his counsel was overruled, that he had wanted his attorney present during any questioning, that he had been told he was not being placed under arrest, and that he had not felt it necessary to tell the officers about his activities. Defendant was also asked why he had not told his mother about the Leos alibi. A defense objection to this question was also overruled. During closing argument the prosecutor urged that these instances of pretrial silence undermined the credibility of defendant's alibi defense.

Defendant contends that using his pretrial silence to impeach his alibi testimony violated his Fifth Amendment privilege against self-incrimination as well as his Sixth Amendment right to counsel. We do not find it necessary to address the merits of these contentions. Given defendant's testimony on direct examination that he had been advised by his attorney not to discuss the case, the unchallenged evidence that he had not mentioned the Leos alibi to his attorney or to Butler, and the strong evidence of defendant's guilt, the jury's verdict could not have been affected by the evidence and brief comment regarding defendant's failure to relate the Leos alibi to the sheriff's deputies at Butler's apartment. Any error was harmless beyond a reasonable doubt.

### O. *Prosecutorial Misconduct During Argument.*

Defendant contends that statements made by the prosecutor in closing argument at the guilt phase were improper and constituted misconduct.

 Defendant's failure to object to any of the statements he now cites as misconduct constituted a waiver of the issues unless an admonition would not have cured the harm. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Green, supra,* 27 Cal.3d 1, 34.) This rule applies to capital as well as noncapital cases. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 108, fn. 30.) To determine whether an admonition would have been effective, we consider the statements in context.

 Defendant argues that the prosecutor improperly attacked his character by referring to him as a "contract killer," a "snake in the jungle," "slick," "tricky," a "pathological liar," and "one of the greatest liars in the history of Fresno County."

Any harm caused by these characterizations could have been cured by an admonition and, in any event, the remarks do not appear to have been misconduct. Referring to the testimony and out-of-court statements of a defendant as "lies" is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 505 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *Escarcega* (1969) 273 Cal.App.2d 853, 862 [78 Cal.Rptr. 785].) Argument may be vigorous and may include opprobrious epithets reasonably warranted by the evidence. (See, e.g., *People* v. *Thornton, supra,* 11 Cal.3d 738, 763 ["a person who is a devotee of Marquis de Sade, a practitioner of sadism"]; *People* v. *Mitchell* (1966) 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211] ["professional robber"]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 540 [30 Cal.Rptr. 538, 381 P.2d 394] ["cop-killers"]; *People* v. *Terry* (1962) 57 Cal.2d 538, 561-562 [21 Cal.Rptr. 185, 370 P.2d 985] ["animal" and one of the most "vicious gunmen and killers"].) The prosecutor's comments were based on the evidence and amounted to no more than vigorous but fair argument.

 Defendant also complains of two comments by the prosecutor concerning his courtroom demeanor. The first comment concerned defendant's failure to show emotion when testifying ("he doesn't act emotionally, you saw him sitting on the witness stand . . . he didn't have any emotion") and the other concerned his note taking during the prosecutor's argument ("Look at him there writing right now, getting ready, making notes, getting ready right now for the defense, still manipulating . . . All through the trial, did the same thing").

Comment on a defendant's demeanor as a witness is clearly proper and comment on courtroom demeanor may be proper under some circumstances. (See, e.g., *People* v. *Heishman* (1988) 45 Cal.3d 147, 197 [246

Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Thornton, supra,* 11 Cal.3d at p. 763.) In support of the contention that prosecutorial comment in argument on an accused's courtroom demeanor should result in reversal, defendant relies primarily on *U.S.* v. *Schuler* (9th Cir. 1987) 813 F.2d 978, in which a divided court held that a prosecutor's comment during argument on a nontestifying defendant's laughter during testimony was misconduct warranting reversal of the judgment. That decision was expressly premised on the reasoning that prosecutorial comment impinges on the defendant's Fifth Amendment right not to testify (at p. 981) and thus it can have no application to a case such as this where the defendant has testified and put his credibility in issue.

We need not decide whether it was misconduct to comment on defendant's note taking, as any harm from this brief and mild comment could have been cured by an admonition.

P. *Advisement on Consequences of Guilty Plea.*

As noted, after jury selection defendant withdrew his not guilty plea to the charge of solicitation to commit murder and entered a plea of guilty to that charge. During the ensuing trial the transcript of the entry of this plea was read to the jury and evidence regarding the solicitation was admitted. Following the penalty trial and the return of the death verdicts, defendant made a brief oral motion to withdraw his guilty plea, stating that when the plea was entered he was "under extreme emotional strain and was not aware of the consequences and the effect that this might have in the future on him." He did not explain which consequences he had not been aware of. The court denied the motion.

Defendant now contends that the guilty plea to the solicitation charge was involuntary because he was not advised on the record that the plea could be used as a circumstance in aggravation justifying imposition of the death penalty.

In compliance with the mandates of *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], we have held that when a guilty plea is accepted the record must contain on its face direct evidence that the defendant was advised of the rights to confrontation, to jury trial, and against self-incrimination, as well as the nature of the charge and the consequences of the plea. (*In re Tahl, supra,* 1 Cal.3d 122, 132.) ▆▆▆ However, the requirement that an accused be advised of the consequences of the plea is not constitutionally compelled and failure to advise as to consequences constitutes error which requires that the plea be set aside only if prejudice is demonstrated. (*People* v. *Wright* (1987) 43 Cal.3d 487, 495 [233 Cal.Rptr.

69, 729 P.2d 260]; *In re Michael B.* (1980) 28 Cal.3d 548, 555 [169 Cal.Rptr. 723, 620 P.2d 173]; *In re Ronald E.* (1977) 19 Cal.3d 315, 321 [137 Cal.Rptr. 781, 562 P.2d 684].)

The record of the guilty plea proceeding demonstrates that defendant was advised of the full range of permissible sentences for the crime of solicitation to commit murder, of the possibility of deportation if he were not a citizen, and of the requirements of parole and the possibility of reimprisonment for parole violations. Defendant and his attorney affirmed that they had had sufficient time to discuss "all the ramifications" of the guilty plea. The court advised defendant that the plea would not be accepted if defendant believed that by doing so the "tape recording might not be admitted into evidence in the other portion of the trial." Defendant replied that he was not acting under that belief and understood that the court had not yet ruled on the admissibility of the tape evidence.

In deciding whether a defendant must be advised of a particular consequence (other than the range of sentence possibilities) before entering a guilty plea, factors to be considered include the severity of the consequence and whether it follows directly and inevitably from the conviction. (See, e.g., *In re Birch* (1973) 10 Cal.3d 314, 321 [110 Cal.Rptr. 212, 515 P.2d 12] [advisement regarding sex offender registration required "in view of the unusual and onerous nature of the . . . requirement that follows inexorably from a conviction . . . ."].) Here the potential consequence of use to impose a sentence of death is unquestionably severe, but the consequence occurred only because defendant was subsequently convicted of the murder charge and the special circumstance allegations were found true.

We need not decide whether the trial court erred in failing to advise defendant of the potential use of the solicitation conviction as a circumstance in aggravation because defendant has failed to demonstrate prejudice. Defendant has not denied that he was aware of the potential use of the solicitation as an aggravating circumstance. This is hardly an unusual or unexpected consequence, and it is reasonable to infer, in the absence of evidence to the contrary, that defendant was aware of it. Moreover, the evidence against defendant on the solicitation charge was overwhelming and he has not demonstrated that he had any defense whatever, so that defendant undoubtedly realized a conviction would inevitably result were the matter to be submitted to the jury. There is no reasonable probability that defendant would not have entered the plea had he been advised of this consequence.

## IV. PENALTY PHASE ISSUES

As we shall explain, the judgment must be reversed as to penalty because the jury was led to believe that the absence of evidence of statutory

mitigating factors permitted those factors to be considered in aggravation and that evidence of a defendant's character and background could be considered in aggravation, and, most significantly, because the jury may have been misled to defendant's prejudice concerning the nature of the process for determining penalty under the 1978 death penalty law. This determination makes it unnecessary for us to consider most of defendant's contentions relating to the penalty phase.[13]

### A. *Character as an Aggravating Factor.*

 The prosecutor argued that defendant's "background and history, based on the fact that he's had all the breaks and then decides to kill for no reason at all, or no good reason, is an aggravating factor." Section 190.3 factor (k) provides that the jury may consider in determining penalty "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Evidence of a defendant's character and background is admissible under factor (k) only to *extenuate* the gravity of the crime; it cannot be used as a factor in aggravation. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) The prosecution may rebut evidence of good character or childhood deprivation or hardship with evidence relating directly to the particular incidents or character traits on which the defendant seeks to rely (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 792, fn. 24), and may argue that this mitigating factor is inapplicable, but factor (k) evidence may not be used affirmatively as a circumstance in aggravation. Accordingly, the prosecutor acted improperly in urging the jury to view defendant's background as an aggravating factor.[14]

---

[13] The major penalty phase contentions raised by defendant but not considered in this opinion are: (1) the trial court erred in denying defendant's motion for a new jury or additional voir dire at the penalty phase; (2) evidence of the solicitation of murder was improperly admitted; (3) the jury instructions permitted improper double counting of aggravating factors; (4) the prosecutor's reference during argument to a notorious death penalty case constituted prejudicial misconduct; (5) the jury instructions failed to adequately inform the jury of its responsibility to consider character and background evidence (see *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813]); (6) the jury was improperly precluded from considering the psychological impact of the spousal rape prosecution as a circumstance in mitigation; (7) evidence regarding the manner in which death sentences are executed was improperly excluded; (8) an instruction on a defendant's right not to testify should have been given sua sponte; (9) an instruction to apply the reasonable-doubt standard to the weighing of aggravating and mitigating circumstances should have been given; (10) the death penalty is disproportionate and arbitrary under the facts of this case; (11) four prospective jurors were erroneously excluded for cause because of their views on the death penalty; and (12) the trial court erred in denying the automatic motion for modification of penalty under section 190.4, subdivision (e).

[14] In a related contention, defendant maintains that the prosecutor improperly urged the jury to consider defendant's age as a factor in aggravation. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789.) As we have recently explained, however, either counsel may argue any age-

### B. *Absence of Mitigation as Aggravation (Davenport Error).*

 During his penalty phase argument, the prosecutor used a chart with one column for aggravating factors and another for mitigating factors. While this chart is not part of the record, it may be reconstructed from the remarks of counsel. On the mitigating side the prosecutor entered "sympathy," with a question mark, and the absence of prior felony convictions. On the aggravating side were the circumstances of the crime, criminal activity by the defendant involving violence, extreme mental or emotional disturbance, moral justification, extreme duress, defendant's age, and defendant's character and background.

The prosecutor argued at length that Lela's murder was not the result of extreme mental or emotional disturbance or extreme duress and that it was completely without moral justification. While he did not use the word "aggravating" when discussing these factors individually, he concluded this discussion by stating: "Now, again, when you're considering the circumstances in aggravation, you're considering all of those factors that I'm arguing."[15] The necessary implication of the prosecutor's argument was that each factor must be either aggravating or mitigating and that if it was not mitigating, it must be aggravating. The chart, of course, graphically conveyed this view.

In *Davenport, supra,* 41 Cal.3d 247, 289-290, we held it improper for a prosecutor to argue that the absence of evidence of a statutory factor permitted or required that the factor be considered as one in aggravation. Thus the absence of evidence showing moral justification, extreme duress, extreme emotional disturbance, or childhood deprivation cannot be factors in aggravation. As we noted in *Davenport,* the factors mentioned in section 190.3 are to be considered only if relevant, and a mitigating factor such as duress or moral justification is irrelevant and should be disregarded when there is no evidence of its existence.

---

related matter or inference suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) The prosecutor's comments regarding defendant's maturity were permissible under this standard.

[15] This quotation reveals how the prosecutor typically used the terms "aggravating factor" and "aggravating circumstance" interchangeably. Had the prosecutor drawn a clear distinction between the statutory factors of moral justification, duress, etc., which could only be mitigating, and circumstances shown by the evidence, which could be "aggravating" in the sense of rebutting other evidence tending to prove the factor, the prosecutor might possibly have avoided *Davenport* error (*People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861]).

Here it was improper for the prosecutor to argue that the lack of evidence proving statutory mitigating factors provided additional factors in aggravation, additional reasons to impose a sentence of death.[16]

 If we could be confident that the jury properly understood the nature of the weighing process and its relation to the appropriateness determination, the two errors so far discussed would probably not be prejudicial. However, as we shall explain, we do not have this confidence.

C. *Instructions and Argument Regarding the Sentencing Process.*

 Section 190.3 provides that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances."

We have held that an instruction using this language without elaboration is potentially confusing and could mislead the jury as to the manner in which penalty should be determined. (*People* v. *Brown, supra,* 40 Cal.3d 512, 544, fn. 17.) One danger is that the jury will perform the weighing process in a mechanical fashion by comparing the number of factors in aggravation with the number in mitigation, or by the arbitrary assignment of weights to the factors. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].) The other danger is that the jury will fail to understand that our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances. (*People* v. *Allen, supra,* at p. 1277; *People* v. *Brown, supra,* at p. 541.)

---

[16] Defense counsel's failure to object to the prosecutor's argument on these grounds would normally be deemed a waiver of any error. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.) However, this case was tried before our decision in *Davenport, supra,* 41 Cal.3d 247. As the law at that time was unclear, it would be unfair to characterize the prosecutor's argument as misconduct or defense counsel's failure to object as either a tactical decision or evidence of incompetence. Whether an objection to prosecutorial argument on *Davenport* grounds will be required in pre-*Davenport* cases is a difficult issue on which the decisions of this court are not entirely clear. (Compare *People* v. *Brown* (1988) 46 Cal.3d 432, 455-456 with *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, fn. 15 [245 Cal.Rptr. 185, 750 P.2d 1342].) We find it unnecessary to attempt a final resolution of the issue in this case because here the *Davenport* error does not exist in isolation but serves to exacerbate so-called "*Brown*" error (see *People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]). We conclude only that failure to object does not bar review of *Davenport* error under these circumstances.

 In this pre-*Brown* case, the jury was given the following instruction, which described the penalty determination process substantially in the unadorned language of section 190.3: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the aggravating circumstances do not outweigh the mitigating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole."

With respect to the first source of potential confusion—the nature of the weighing process—a supplemental explanatory instruction was given: "In considering, taking into account and being guided by the aggravating and mitigating circumstances, you may not decide the effect of such circumstances by the simple process of counting the number of circumstances on each side. The particular weight of such opposing circumstances is not determined by their relative number, but rather by their relative convincing force on the ultimate question of punishment." However, the trial court refused to give a properly worded instruction requested by defendant to the effect that one mitigating circumstance "may be sufficient to support a decision that death is not the appropriate punishment in this case" and that the weight to be given any factor was to be decided by each juror individually.

On the whole, the arguments of counsel were not seriously misleading regarding the nonquantitative nature of the weighing process. Although the prosecutor's use of a chart and his argument implied there was significance in what he maintained was a lesser number of factors "on the mitigating side," both the prosecutor and defense counsel correctly stated in argument that the weighing process was qualitative and that the sheer number of factors in aggravation or mitigation was not determinative.

With respect to the second source of potential confusion identified in *Brown, supra,* 40 Cal.3d at page 541, however, there is a substantial danger the jury was misled with respect to the proper context of the weighing process and the nature of the determination it was intended to achieve. No instruction was given which informed the jury "about its sole responsibility to determine, based on its individualized weighing discretion, whether death is appropriate in this case." (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1278.) Nor was any equivalent ameliorative instruction given. We have explained that "when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily under-

stand they have discretion to determine the appropriate penalty" (*People* v. *Boyde* (1988) 46 Cal.3d 212, 253 [250 Cal.Rptr. 83, 758 P.2d 25]) but, as we have noted, the trial court here declined to give defendant's requested instruction which would have informed the jurors that the weight to be given any factor was to be decided by each juror individually. The failure to give any sufficient clarifying instruction on this crucial aspect of the penalty determination process requires us to examine the whole record, including the arguments of counsel, to determine whether the jury may have been misled to defendant's prejudice concerning the proper scope of its sentencing discretion. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 650-651 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

In explaining the jury's role at the penalty phase, we have stated that the jury exercises an essentially normative task, acting as the community's representative, that it may apply its own moral standards to the aggravating and mitigating evidence presented, and that it has ultimate responsibility for determining if death is the appropriate penalty for the particular offense and offender. (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1287; see also, *People* v. *Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395] [penalty decision is "a normative judgment reflecting the juror's individual moral assessment of the defendant's culpability"]; *People* v. *Brown, supra,* 46 Cal.3d 432, 448 [role of capital penalty jury is "to render an individualized, *normative* determination about the penalty appropriate for the particular defendant—i.e., whether he should live or die"]; *People* v. *Karis* (1988) 46 Cal.3d 612, 639 [250 Cal.Rptr. 659, 758 P.2d 1189] ["In weighing the appropriate penalty, deciding between death and life imprisonment without possibility of parole, the jury performs a normative function, applying the values of the community to the decision after considering the circumstances of the offense and the character and record of the defendant"].) In examining the arguments of counsel, we look for acknowledgement and explanation of these concepts.

During his opening argument, the prosecutor repeatedly stated that the jury's function was "just" to weigh the aggravating circumstances against the mitigating circumstances and he stressed that a verdict of death was mandatory if aggravating circumstances preponderated.[17] These remarks

---

[17]The prosecutor argued as follows: ". . . The law says, that you, the jurors, who have told us that you will follow the law when we selected you, are to weigh the mitigating factors and the aggravating factors. You're just weighing those. If you find that the aggravating factors outweigh the mitigating factors you return the death penalty. There's no proof beyond a reasonable doubt. You are just weighing . . . .

". . . . . . . . . . . . . . . .

echoed the language of the statute and of the instruction. While not incorrect, they were potentially misleading without an explanation that the weighing process is the method by which the jury determines from the relevant evidence which of two penalties—death or life without possibility of parole—is most appropriate under all the circumstances and without some express or implied recognition that the process requires the jurors individually to make a difficult moral decision on the appropriateness of the chosen punishment. The prosecutor's opening argument contained no such explanation.

As described by the prosecutor, the aim of the weighing process appeared to be determining whether there was "more bad than good about the defendant" rather than whether the bad was so substantial in comparison to the good that it warranted death instead of life without parole. (*People* v. *Brown, supra,* 40 Cal.3d at pp. 541-542, fn. 13.) This was particularly noticeable in the prosecutor's discussion of the factors of sympathy, moral justification, and mental or emotional disturbance.

Several of the prosecutor's remarks tended to discourage the jury from considering the consequences of the penalty verdict. For example, he stated: "[W]hen you are deciding these factors, all of them—sympathy, background, character, history—you are to decide those based on the evidence that has been presented in this courtroom, not on general philosophy of the concepts of the death penalty." While the existence of the factors depends on the evidence, it is also true that their proper evaluation requires a moral judgment in relation to the death penalty. And while a penalty verdict in a capital case should not be based on "general philosophy of the concepts of the death penalty," it is also true that the appropriateness determination presumes an understanding and appreciation of the gravity of the ultimate punishment. Thus the prosecutor's argument presented as mutually exclusive alternatives what in fact are separate and equally essential components of the penalty determination process.

The prosecutor presented this distorted picture of the penalty determination process again at the conclusion of his opening argument: "And if the aggravating—if the aggravating circumstances outweigh the mitigating, you're obligated to and you would not be doing the criminal justice system a

---

". . . it's just a weighing process. And if you find that the aggravating outweighs the mitigating . . . you shall and must return the death penalty. There is no discretion there[ ]after the weighing process, you must return the death penalty.

". . . . . . . . . . . . . . .

". . . all you really have to do, ladies and gentlemen, is weigh. . . . . If after you weigh these aggravating circumstances they outweigh the mitigating, you only have one duty, that you must follow, and I think you will."

favor *if you said, for example, do we feel in general the death penalty should be applied in this case? That's not the law.* The law is to weigh the aggravating circumstances. And you can have that instruction read and re-read, that's the law. It's not philosophical stuff about the death penalty." (Italics added.) These statements, which urged the jury to conduct the weighing process without reference to the jury's view of the appropriateness of the alternative penalties, were gravely misleading.

Not once did the prosecutor use the word "appropriate" or state in substance that the jurors were to exercise moral judgment in deciding whether death was the appropriate penalty for this defendant. He never discussed the penalty of life without parole or attempted to demonstrate why it would not be appropriate. He stated there was "no discretion" after the weighing process and he cautioned the jurors *not* to be guided by whether they felt the death penalty should be applied in this particular case.

Defense counsel's opening argument was a thorough and forceful explication of the jury's role in sentencing. Counsel stressed the importance of considering what the two alternative penalties were and deciding which was appropriate under the facts of the case. He also stressed the individualized and moral or normative nature of the decision required of each juror.

The prosecutor did not adopt or endorse the views expressed by defense counsel. Indeed, when defense counsel argued that the law required the jurors to determine "whether the nature of the offense and the offender are such that death must be imposed" and that the death penalty should not be selected unless "both the nature of the offense and offender are so aggravating that they [*sic*] must be wiped from our midst, like a mad dog," the prosecutor objected that this was not a correct statement of the law.[18] The court overruled the objection but with the remarks that counsel was being given wide latitude and that the jury had been instructed on the law. This could well have left the jury under the impression they were not obliged to consider whether death was appropriate in relation to the circumstances of the offense and the character and record of the defendant.

During his rebuttal argument the prosecutor criticized defense counsel's references to the death verdict as a decision to "kill" defendant.[19] The

---

[18] In view of the prosecutor's later argument that the death penalty was not reserved exclusively for the most egregious cases, such as mass murder or the slaying of nationally prominent individuals, his objection may have been directed at the "mad dog" language, rather than to defense counsel's statement that the jury should evaluate the appropriateness of the death penalty in light of both the offense and the offender. Our concern, however, is not with the prosecutor's subjective intent but with the probable effect of the objection on the jury's understanding of the process of sentence determination.

[19] The prosecutor argued: ". . . that's the basis of [defense counsel's] argument: can you put this man to death? You notice how many times he says are you going to kill Mr. Edel-

prosecutor also repeated his statements that the determination of penalty was "simply" a weighing process and that the death sentence was mandatory if aggravating circumstances preponderated.[20] Again the prosecutor implied that jury was to weigh good against bad rather than life against death.[21] Nowhere in his rebuttal did the prosecutor refer to the necessity of determining which of the two penalties was appropriate or acknowledge that jurors were required to face a difficult moral question. The prosecutor concluded his rebuttal by again directing the jurors attention away from the gravity of the ultimate punishment: "And my least [*sic*] request would be that as a responsible juror knowing that your job is not philosophical discussion about the death penalty, but to weigh the aggravating circumstances versus mitigating, and that if you find that the aggravating circumstances outweigh the mitigating that you have no hesitation to return the death penalty, thank you."

The prosecutor and defense counsel, through their arguments, constructed starkly different models of the sentencing process. The model suggested by defense counsel was accurate in its essential features, while the prosecutor's model failed to incorporate features which we held in *Brown, supra,* 40 Cal.3d 512, to be essential components for valid imposition of the death penalty. We have no way of knowing which model the jurors adopted in reaching their penalty verdict, and there appears to be a reasonable possibility that the jury was misled as to the nature of its ultimate duty at the penalty phase.

As in *People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669], we conclude that the jury in this case may well have been persuaded to adopt the view that its responsibility was merely to weigh aggravating and mitigating factors without regard to the appropriateness of

---

bacher? You know that's a trial tactic to get in your mind that you're doing something so you could go home and have it on your conscience."

[20] For example, the prosecutor argued: ". . . you're going to be instructed to weigh these aggravating factors and mitigating factors. And if the aggravating outweigh the mitigating you return the penalty of death. It's as simple as that, and it doesn't matter what [defense counsel] feels.

" . . . . . . . . . . . . . . . .

"The law says if you consider these aggravating circumstances here and that they outweigh these mitigating circumstances, you shall return the penalty of death. And none of that sympathetic argument that the defendant has tried to offer you in any way can detract from what your duty will be or should be as a juror in this case."

[21] I.e., "Then he [defense counsel] tells us about the witnesses that he paraded here yesterday, and he tells us that that outweighs killing a woman in the lateness of the night with a shotgun in the back. [¶] *You know how he justifies the killing of Lela?* He says the defendant did kill Lela, didn't he try to reconcile with her, as if to say that because she rejected him and he tried to reconcile that was the basis, and that was a reason to kill the woman. That doesn't make any sense." (Italics added.)

the alternative penalties and that it was required to return a sentence of death if aggravating factors preponderated without each juror making a personal conclusion from the evidence that death was appropriate under the circumstances for the offense and the offender.

## V. DISPOSITION

Insofar as it imposes the death penalty, the judgment is reversed. In all other respects the judgment is affirmed.

**MOSK, J.—** ██ I concur in the judgment and in the lead opinion's discussion of the penalty phase issues. But, unlike the lead opinion, I would address the issue of defendant's pretrial silence. Here the prosecutor believed that defendant's prearrest silence is not immunized from later cross-examination and adverse comment. There are several problems with invoking such a blanket rule in this case. Under these circumstances the trial court erred in overruling defense objections.

First of all, there are some authorities that would prevent interrogation or argument concerning silence prior to arrest. As noted in *People* v. *Free* (1982) 131 Cal.App.3d 155, 166 [182 Cal.Rptr. 259], California cases have consistently relied on the privilege against self-incrimination to preclude reference to silence. Said that court, "There is danger in a rule which requires a defendant to go to the police and tell them that he shot and killed a man, as in this case, in order to avoid his silence being used against him; such impinges on his self-incrimination privilege. . . . Admission of prearrest silence weakens the concept that the state should be made to shoulder the entire load of proving its case."

If silence, either prearrest or postarrest, can be freely used against a defendant, perhaps we should require the following Catch-22 admonition to every suspect: "If you say anything, it will be used against you; if you do not say anything, that will be used against you." (*Ivey* v. *United States* (5th Cir. 1965) 344 F.2d 770, 773.)

Second, even if under some circumstances prearrest silence can be used against a defendant, the silence here was in actuality postarrest. In this case we have a defendant who was under law enforcement restraint, and a prosecutor who cross-examined him about his silence under those circumstances and who later argued the point to the jury.

After the killing, law enforcement agencies were "on the lookout" for defendant. Several deputy sheriffs entered his home and immediately hand-

cuffed defendant. This was, as provided in Penal Code section 835, an arrest "made by an actual restraint of the person." While so restrained defendant was interrogated, but declined any explanation or comment other than that he wanted his attorney to be present.

On cross-examination the prosecutor asked defendant, over objection, why he did not tell the police his whereabouts at the time of the killing. And to the jury, the prosecutor argued: "when Detective Johansen goes to his residence, what is the first thing that he says? 'I want my lawyer.' He doesn't say one thing, he doesn't come out with Carol Leos' alibi, he wants the lawyer." That same argument was repeated.

*People* v. *Jacobs* (1984) 158 Cal.App.3d 740, 750 [204 Cal.Rptr. 849], held, "questioning appellant on cross-examination about his silence occurring both during and following his arrest violated appellant's privilege against self-incrimination under California Constitution, article I, section 15." Similarly, *People* v. *Fondron* (1984) 157 Cal.App.3d 390, 400 [204 Cal.Rptr. 457], declared "reference to appellant's postarrest silence during closing argument was improper."

In *People* v. *Gaines* (1980) 103 Cal.App.3d 89, 94-95 [162 Cal.Rptr. 827], Justice Elkington, for himself and Justices Racanelli and Grodin, relied on the discussion in *United States* v. *Hale* (1975) 422 U.S. 171 [45 L.Ed.2d 99, 95 S.Ct. 2133], to reach a similar conclusion: "[S]ilence at the time of arrest may be inherently ambiguous even apart from the effect of *Miranda* warnings' [citation]; and . . . the error does not depend upon previous *Miranda* warnings, but 'lies in the cross-examination on this question [of postarrest silence), thereby implying an inconsistency that the jury might construe as evidence of guilt' [citation]. The evil lies in the 'insoluble ambiguity' of such evidence, which . . . 'is of little probative force' [citation], for these reasons: 'At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. . . . [T]he arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.'"

In *People* v. *Cockrell* (1965) 63 Cal.2d 659, 670 [47 Cal.Rptr. 788, 408 P.2d 116], Justice Burke, for our unanimous court, declared that "even though it does not appear that [appellant] made any statement indicating that he was invoking his privilege against self-incrimination, he had a right to remain silent and an inference adverse to him may not be drawn from his silence."

Finally, this defendant properly and in a timely manner invoked a legal right to remain silent. It is clear that after *Miranda* warnings (*Miranda* v.

*Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) have been given, a suspect's right to remain silent must be protected against any adverse imputation. (*Doyle* v. *Ohio* (1976) 426 U.S. 610, 617 [49 L.Ed.2d 91, 97, 96 S.Ct. 2240].) The question that arises here is whether defendant effectively invoked *Miranda* rights by demanding a lawyer to be present, even though the warnings had not been given. It seems clear to me that he did. Therefore any cross-examination and comment on his silence at that time and thereafter was clearly improper.

I need cite no additional authority to confirm the right of a criminal suspect to have counsel present at interrogation. *United States* v. *Williams* (D.C. Cir. 1977) 556 F.2d 65, 67, held that "testimony about the desire or request for a lawyer is impermissible."

Our issue in the instant case should not be whether evidence and argument on silence was proper—it was not—but whether its improper use was prejudicial or harmless. In view of the substantial evidence of defendant's guilt I would hold the error to be harmless.

Broussard, J. concurred.

**PANELLI, J.**—I concur in the judgment reversing the death penalty imposed in this case. I do so not as a result of any one particular or specific argument made by the prosecutor to the jury during the penalty phase closing argument, but rather on a qualitative evaluation of the instructions given and the arguments made taken as a whole. In arriving at my conclusion, I reiterate what I said in my majority opinion in *People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669], "We do not reach our conclusion based on any single statement uttered by the prosecutor. Rather, we consider the instructions of the court and the arguments of both prosecutor and defense counsel. [Citation.] Evaluating the record as a whole, we conclude that [there is a reasonable possibility] the jury in this case was misled as to its discretion and its responsibility in reaching its sentencing verdict . . . ." In this case such an evaluation results in a reversal of the jury's penalty determination.

**LUCAS, C. J.**— ██
 I concur in the judgment to the extent it affirms guilt with special circumstance findings. I dissent, however, to the reversal of the death penalty based on the cumulative effect of supposedly misleading prosecutorial argument. In light of *three special instructions* given by the court, any prosecutorial misstatements were harmless and could not have affected the jury's verdict.

1. *Boyd error*—The prosecutor argued that defendant's background and character were negative factors which really should count against him. ("[T]he fact that he's had all the breaks and then decides to kill for no reason at all, or no good reason, is an aggravating factor.") As the lead opinion herein observes, background evidence elicited under factor (k) is limited to mitigating evidence, and proof of defendant's bad character is inadmissible except for rebuttal purposes. (*People v. Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].)

Here, the prosecutor did not purport to *introduce* aggravating evidence in contravention of *Boyd*; the jury was not presented with any inadmissible evidence. Instead, the prosecutor simply *argued* that defendant's background should be deemed a factor in aggravation. Although the prosecutor probably should not have phrased his argument in that manner, he was certainly entitled to make essentially the same point by observing that defendant's mitigating background evidence was worth little consideration. Thus, the argument was clearly harmless.

2. *Davenport error*—Similarly, the prosecutor suggested that the absence of a mitigating factor could be deemed aggravating in deciding the penalty issue. (*People v. Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861].) As with the prosecutor's statement regarding defendant's background, any error here was not an evidentiary one but merely amounted to overzealous argument.

We have never held that *Davenport* error alone could constitute reversible error, and indeed the lead opinion, *ante,* at page 1035 acknowledges that the foregoing *Boyd* and *Davenport* errors "would probably not be prejudicial," if we could be assured that the jury properly understood its sentencing responsibilities. That brings us to the final ground for reversal.

3. *Brown error*—The lead opinion believes the prosecutor's arguments misled the jury regarding its sentencing responsibilities. (*People v. Brown* (1985) 40 Cal.3d 512 [250 Cal.Rptr. 637, 709 P.2d 440].) Not so. In light of the special instructions given by the court, coupled with defense counsel's clarifying arguments, it is not reasonably possible the jury was misled in this case.

First, the court modified sentencing factor (k), so that the jury could consider "the defendant's character, background, history, and mental condition" as mitigating circumstances. Second, the jury was told to weigh "the sympathetic elements of defendant's background against those that may offend the conscience. In doing so, you may consider pity, sympathy, and mercy."

Finally, the court gave the following elaborate explanation of the penalty determination process, emphasizing that the process involves a weighing, not mere counting, of the applicable sentencing factors: "In considering, taking into account and being guided by the aggravating and mitigating circumstances, you may not decide the effect of such circumstances by the simple process of counting the number of circumstances on each side. The particular weight of such opposing circumstances is not determined by their relative number, but rather by their relative convincing force on the ultimate question of punishment."

Despite the giving of the foregoing proper special instructions, the lead opinion would reverse penalty because of various prosecutorial remarks which supposedly misled the jury regarding its sentencing task. (In brief, the prosecutor emphasized the importance of the process of weighing the aggravating and mitigating factors, and cautioned the jury not to rely on "general philosophy of the concepts of the death penalty," or "philosophical stuff" about the death penalty, such as whether "in general" the death penalty should be applied in this case.) These remarks purportedly (1) failed to explain that the jury was to determine the appropriate penalty under all the evidence, and (2) tended to discourage the jury from considering the grave consequences of the penalty verdict.

In light of the special instructions given here, I submit it was highly unlikely that the jury failed to realize that it was to determine the "appropriate" penalty for defendant. What else would a juror do after being told to "weigh the sympathetic elements of defendant's background" and determine the "relative convincing force" of the various aggravating and mitigating factors "on the ultimate question of punishment"? If the lead opinion means to suggest that the jurors must also be told they may base their decision on vague "personal" factors beyond those specified in the death penalty statute, it is simply wrong. (See *People v. Hendricks* (1988) 44 Cal.3d 635, 653-655 [244 Cal.Rptr. 181, 749 P.2d 836] [prosecutor told jurors to "follow the law" and argued that their penalty decision was "automatic" once the weighing process was concluded].)

As for the prosecutor's remarks about death penalty "philosophy," surely the jury properly interpreted them as merely precluding further debate on the wisdom of the death penalty in general, rather than the appropriateness of death in this case.

The lead opinion acknowledges that defense counsel gave a "thorough and forceful explication of the jury's role in sentencing." (*Ante*, p. 1039.) For example, counsel repeatedly argued that death was not the "appropriate" penalty in this case, he explained that each juror must decide for

himself what weight to assign to the various sentencing factors, and he noted that the responsibility for deciding defendant's fate rests with each individual juror.

After the prosecutor on rebuttal attempted to minimize the importance of defendant's "sympathy" evidence, suggesting that such evidence might "detract" the jury from its "duty" in the case, defense counsel in his closing argument presented a strong response to the contrary. Counsel explained that under the law defendant cannot be executed unless each juror individually "wants to kill him," and he urged the jurors to rely on principles of "justice," "mercy" and "sympathy" to reach a verdict of life without parole.

Thus, in my view, any possible confusion created by the prosecutor was clearly dispelled by defense counsel. (See *People* v. *Odle* (1988) 45 Cal.3d 386, 421 [247 Cal.Rptr. 137, 754 P.2d 184] ["any doubt we may have had about the jury's understanding of its duty and responsibility . . . is dispelled by defense counsel's argument"].)

For all the foregoing reasons, I would not reverse the penalty on *Brown* grounds.

Arguelles, J., and Eagleson, J., concurred.