Filed 11/6/24  P. v. Lang CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> FLOYD LANG, <br><br> Defendant and Appellant. | D082993 <br><br><br> (Super. Ct. No. FSB22000828) |


APPEAL from a judgment of the Superior Court of San Bernardino County, Cheryl C. Kersey, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Floyd Lang of murder and attempted murder and found true related allegations.  It was undisputed Lang was driving in the area hours before surveillance video captured the drive-by shooting, but his

counsel argued the real killer was someone else in a similar white SUV. On appeal, Lang raises two categories of issues.

First, Lang claims prejudicial error when the trial court prohibited (1) the surviving victim's testimony and past statements about being a gang dropout, and his belief that a Hispanic gang member shot him as a result; and (2) expert testimony about gang dropouts being targets of gang violence. We agree with the People that this third-party culpability evidence was irrelevant, and thus properly excluded, because it offered only a speculative motive without tying anyone else to the crime. And the ruling did not deprive Lang of his mistaken-identity defense, as he elicited testimony from the survivor describing the shooter as a different race than Lang, a fact emphasized in closing arguments.

Second, Lang contends the court prejudicially erred by permitting a detective to identify Lang as (1) the driver of the white SUV and (2) the shooter. Because that lay opinion testimony helped the jury tease out details from the surveillance video, it was admissible for the detective to identify Lang as the driver and the white SUV as his. Although it was improper for the detective to essentially opine on guilt by calling Lang the shooter, Lang neither preserved that issue for appeal nor was prejudiced by the error.

Thus, we affirm.

## I.

Around 1:11 a.m. in Colton, a white SUV with black rims drove alongside and fired a gun into a vehicle containing Richard Laguna and Able S. Laguna died, and a bullet struck Able's arm.

## A.

Shortly after, a law enforcement officer spoke with Able, who believed two people were in the SUV. According to Able, "a white SUV car pull[ed] up

2

on the side of us," the SUV's window rolled down, and "the passenger pulled out his hand," which Able thought looked "Hispanic or white." Seeing "bullets fly towards" his face, Able "ducked." He heard three shots.

At trial, Able testified he was "high on crystal meth and Xanax" that night, and "when you are on Xanax, you don't realize a lot of stuff that's happening." He said he saw a white SUV with a driver who "looked Mexican." He could not remember what the shooter wore beyond a mask, but he recalled "the skin color" "wasn't dark." On cross-examination, Able described seeing "a flash and that's it," and he "could have swor[n] it was a Mexican skin color"—but when pressed, he admitted he was "uncertain." Able did not recall telling law enforcement he thought two people were in the white SUV, instead testifying he did not know.

## B.

Detective Anthony Jaeger spent "three to four days" sifting through surveillance video from around where the shooting occurred to identify and track both the victim vehicle and the "white SUV with the black rims." He created a compilation video and an annotated series of eight maps tracking the vehicles' movements.

At trial, Jaeger testified about what the video and maps depicted. The jury watched the video and viewed the maps.

A couple hours before the shooting, Laguna and Able were at a convenience store. Surveillance video shows Lang exited a white SUV with black rims and a black roof rack and entered the store around the same time. Lang wore a black skull cap and a black hooded sweatshirt with a sports team logo on the front. The interior of the sweatshirt's hood is light gray. While Lang was there, Able entered the store and walked past him. Lang

3

eventually returned to his SUV and drove off, and later Able and Laguna walked away from the store.

Not long after, Lang drove his white SUV to a nearby liquor store.

After Lang drove away from the liquor store, no surveillance video captured a white SUV until a little over ten minutes and a couple blocks later. The license plate is not clear, yet Jaeger testified he believed it was the same white SUV Lang was driving in the convenience store surveillance video because it had the same "black rims, the black running boards, and . . . the same roof rack."

The white SUV parked "directly across" from a hotel, "about five cars north of the victim's vehicle."

The victim vehicle later drove to a gas station and eventually parked along a curb by a hotel facing north. "Simultaneously," as Jaeger testified while the video played, the white SUV "with black rims" drove southbound on the same street.

About one minute before the shooting, the white SUV pulled into a nearby parking lot. Jaeger testified about a still photograph from that point in the video. According to him, it shows the same white SUV as seen at the convenience store with "the roof rack" and "the black rims that match." Jaeger pointed out how the driver of the white SUV in the photograph wore a sweatshirt with "what looks like" the sports team logo seen on Lang's sweatshirt at the convenience store and the same "lighter color" inside the hood as well as the same "skull cap, [and] dark subject."

The video proceeds to show the white SUV exit the parking lot onto the same street on which the victim vehicle was parked. The white SUV drove northbound and passed the parked vehicle. It then pulled into a driveway, turned around, and drove southbound on the same street. As it passed the

4

victim vehicle, "the shooting occurs." The video shows, and Jaeger testified, "the muzzle flash" came "from the driver's side compartment of the vehicle."

## C.

Lang was eventually arrested, and Jaeger interviewed him. The interview was played for the jury.

Lang originally denied being in Colton or driving a white SUV. Later, however, he recalled being at the convenience store in Colton and seeing a Hispanic man "wearing a jersey"—Able. Lang remembered Able and another man because they seemed "cocky" and "too arrogant." Lang claimed he left the store to go home but, when pressed, admitted he may have gone "to get more drugs."

## D.

At trial, the prosecutor presented testimony from an expert in cell phone records and geolocation data. The expert identified Lang's phone number based on footage of and phone usage during a traffic stop the evening after the shooting. The expert used the phone number to approximate the locations where Lang's phone made or received calls leading up to and after the shooting.

About three hours before the shooting, a call placed Lang's phone "someplace west of our significant locations." When the video shows Lang at the liquor store, his phone received a call in that area. About twenty minutes before the shooting, an outgoing call from Lang's phone placed the device in the "area that would include the [hotel]." About twenty minutes after the shooting, an outgoing call placed Lang's phone "south of the relevant locations, which is the same direction" the surveillance video shows the white SUV "leaving to or towards" post-shooting.

5

## E.

Lang's counsel argued mistaken identity. He told the jury "there were two white SUVs" the night of the shooting, "one contain[ing] the real shooter" and the other Lang. Defense counsel emphasized a gap in the videos to suggest a different white SUV—driven by "the real shooter," not Lang—was the vehicle shown in the video of the shooting. That Lang and the shooter drove the same white SUV was a "bad coincidence." The still photograph from the video in the parking lot was "not enough," defense counsel argued, because "[n]obody can tell you that that is Mr. Lang."

Instead, "it makes so, so much more sense if it's somebody else." Lang's counsel emphasized Able told law enforcement (1) "it was a Mexican guy not a black guy" who shot him and (2) he saw two people in the car. Lang had no motive, defense counsel explained, while the shooter did. But "w[e] don't know what that [motive] is because we don't know who that person is." According to defense counsel, "it doesn't make sense at all if it's Mr. Lang, and it makes complete sense if it's somebody else" who specifically targeted Laguna and Able. "And so the obvious answer is somebody else was in a similar car."

## F.

The jury found Lang guilty of first degree murder and attempted murder, finding true for each charge that Lang intentionally discharged a firearm causing death or great bodily injury. The trial court sentenced Lang to a total prison term of 82 years to life.

## II.

We group Lang's appellate challenges into two categories—(1) gang-related third-party culpability evidence and (2) identification evidence—and address them in turn.

6

## A.

Lang claims the court erred by excluding testimony from (1) Able about how he "believed" the shooting was "a hit placed on him by his former gang" and (2) an expert on how gang dropouts "are frequently the targets of gang violence." We disagree.

## 1.

Trial courts have "broad discretion" in deciding the relevance of evidence and whether to exclude expert testimony. (*People v. Harris* (2005) 37 Cal.4th 310, 337; *People v. McDowell* (2012) 54 Cal.4th 395, 426.) We review rulings on the admissibility of evidence and expert testimony for abuse of discretion. (*Ibid.*)

Although Lang argues we should independently review his claims because the exclusion of evidence "vital to his defense" purportedly denied him his "federal constitutional rights to fair trial and due process," we disagree for the reasons discussed below.

## 2.

Lang sought to introduce gang-related evidence before, during, and after trial.

Pretrial, the People moved to exclude evidence suggesting "rival Hispanic gang members" had "motive or opportunity" to commit the charged crimes. Lang planned to introduce statements Able made to law enforcement about how he thought a gang member shot him for leaving his gang. Although nobody told Able "they were gonna get" him, he "guess[ed] the word got out" that he dropped out because "that's when [gang members] come lookin' for us." Lang's counsel wanted to explore this topic with Able, as the "entire theory of the defense" was that Lang did not shoot the victims, but rather "a rival gang member" did, and "here's all the reasons" Able thought

7

so, "and then the expert can explain that gang culture to elaborate on [Able's] belief." The evidence would "provide[ ] the motive" and why Able "thought it was a Hispanic male who shot him, not a black male."

The trial court prohibited Lang's counsel from (1) mentioning Able's "speculative statements" and (2) asking Able questions to make him "speculate about the motive." It observed the defense had "not even identified someone who committed this crime or did this shooting." Finding "no nexus" between Able's speculation and the charged offenses, the court excluded the evidence. Defense counsel, however, could ask Able who shot him, and if Able identified the shooter as a Hispanic male, "then clearly that's relevant."

The court reserved ruling on the expert.

During Jaeger's testimony and outside the jury's presence, the court noted it had yet to hear "sufficient evidence" to warrant allowing a gang expert to testify. Lang's counsel did not then argue otherwise.

Later, Lang's counsel claimed any limit on third-party culpability evidence "does not apply to victim statements," so only relevance or materiality could restrict exploring this "gang issue" with Able. Yet, the court noted, "nothing has been presented regarding anybody else at the scene" or in the white SUV. The court stood by its original ruling finding the proffered evidence inadmissible. Thus, Lang could not "invite" Able "to speculate regarding who might have targeted him or shot him."

After trial, Lang moved for a new trial on this ground. For the first time, Lang asserted a gang expert would have testified a witness would not identify another gang member "under any circumstances." The court held firm: Able's "belief" he was targeted as a gang dropout was inadmissible

8

speculation. The jury heard Able describe the shooter as someone not matching Lang, "and the jury rejected that" testimony.

3.

Third-party culpability evidence "tend[s] to show that a party other than the defendant committed the offense charged." (*People v. Hall* (1986) 41 Cal.3d 826, 829.) Third-party culpability evidence "must meet minimum standards of relevance." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1017.) "[E]vidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt." (*People v. Brady* (2010) 50 Cal.4th 547, 558.) Instead, "to be relevant, the evidence must link this third person to the actual commission of the crime." (*Ibid.*)

Lang disputes the at-issue evidence was third-party culpability evidence and contends the trial court "misunderstood the law" when treating it as such. According to Lang, the evidence instead would have (1) "bolstered" Able's "identification of the shooter as a Mexican male, and not Mr. Lang" and (2) "provided a motive for someone else to have shot" the victims. Thus, the evidence would have supported Lang's "defense of mistaken identity." Even so, it remains evidence that someone other than Lang committed the charged offenses, making it third-party culpability evidence. (See *Hall*, 41 Cal.3d at p. 829.)

The trial court properly excluded Lang's proffered gang-related third-party culpability evidence from both Able and a gang expert. Evidence Able was a recent gang dropout who believed he would be targeted as a result and corresponding expert testimony on gang dropout shootings are insufficient to link someone else to the shooting, making the testimony irrelevant. At most, the evidence suggests a possible motive by another

unknown person, which is "not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*Edelbacher*, 47 Cal.3d at p. 1018.)

### 4.

We see no merit in Lang's corresponding constitutional claims based on his right to present a "complete defense." Our Supreme Court has rejected this argument. (*Hall*, 41 Cal.3d at pp. 834-835.) And, as the People note, the ruling here did not prevent Lang from asserting a third-party culpability defense. Lang's counsel elicited testimony from Able describing the shooter as Hispanic, which he emphasized in closing arguments, claiming "somebody else" in a "similar car" was the real shooter. Thus, the court did not prevent Lang from presenting his defense; it "merely rejected certain evidence concerning the defense." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.)

Similarly, although Lang asserts a constitutional right to bolster the credibility of Able's description of the shooter as Hispanic on cross-examination, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination" for "only marginally relevant" questions. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) We therefore perceive no error in limiting irrelevant cross-examination.

### 5.

Because the trial court did not err, we need not reach Lang's related prejudice arguments.

### B.

Next, Lang argues the trial court erred by allowing Jaeger to identify (1) the white SUV in the surveillance video as Lang's and Lang as the driver and (2) Lang as the shooter. We conclude the first category of identification

testimony was permissible. Although the second category was improper, Lang did not preserve that claim and, in any event, that testimony did not prejudice Lang.

1.

The parties agree Jaeger testified as a lay person, not as an expert, so we need not address Lang's theoretical arguments about why his testimony would be inadmissible "[e]ven if" he were an expert.

We review the admission of lay opinion testimony for abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 600.) Lang suggests we should review de novo because he claims prejudicial error affecting his constitutional rights. But because we find no infringement on his constitutional rights, as discussed below, we review for abuse of discretion.

2.

We first address Jaeger's testimony and notations on a map exhibit identifying the white SUV as Lang's and the driver as Lang.

The annotated series of maps Jaeger created to show the movements of the victims' vehicle and the white SUV displays Lang's name twelve times, most often to describe the suspect vehicle's actions, such as "Lang drives" a particular direction and "Lang is parked behind the victim's vehicle."

At trial, Jaeger explained the maps and the activity shown in the compilation video. Sometimes, he referred to the white SUV as "the suspect." But other times he testified, for example, "suspect Lang leaves" a location.

As Jaeger discussed the maps, Lang's counsel interjected to "ask the witness to just refer to the white vehicle that's parked there as opposed to Mr. Lang driving that vehicle," arguing it was a "legal conclusion." The prosecutor countered that Jaeger was expressing "his opinion" based on his understanding of the evidence, "which the jury is free to reject or accept,

11

depending on their conclusions and findings at the end of the case."  The trial court viewed it as a "factual conclusion" and permitted Jaeger to continue identifying Lang, explaining "the evidence will be evaluated on its weight, not its admissibility."

Defense counsel also objected to the map exhibit as being "labeled with legal conclusions which are inappropriate to publish in front of the jury."  He argued it was inappropriate for the labels to "say Mr. Lang this or that" because, aside from the convenience store and liquor store footage where Lang appears in view, the video shows "a similar car and that's it."  The trial court disagreed that the labels were legal conclusions.  It viewed Lang's objection as being the same "argument regarding identification," which it overruled because "all of those things go to weight, not admissibility."

Lay witnesses may offer opinion testimony if it is (1) rationally based on their perception and (2) helpful to a clear understanding of their testimony.  (Evid. Code, § 800.)  "[T]he identity of a person is a proper subject of nonexpert opinion."  (*People v. Perry* (1976) 60 Cal.App.3d 608, 612.) California courts "have long upheld admission of testimony" from law enforcement officers "identifying defendants in surveillance footage or photographs."  (*Leon*, 61 Cal.4th at p. 601.)  To be helpful in this context, the testimony need only to "have aided the jury's identification" of the subject depicted in the surveillance video or photograph.  (*People v. Mixon* (1982) 129 Cal.App.3d 118, 131.)

Here, Lang challenges only the helpfulness of Jaeger's testimony, so we need not address the rational basis issue.  Lang asserts the videos "were either unmistakably clear or hopelessly obscure," so Jaeger was "no better-suited than the jury to make identifications."  Lang focuses on how the driver was not visible "at the time shots were fired."

12

We disagree. Jaeger's testimony was helpful because the video, as the People argue, "lacked the clarity or definition at times to allow jurors to easily identify the shooter." Jaeger helped the jury understand which details to scrutinize in determining if Lang was the person depicted in the video. For example, surveillance video captured the driver of the white SUV "[a]bout a minute" before the shooting. Even in the still photograph of the driver taken from the video, it is difficult at first to discern any clear features. Jaeger pointed out details, like the color and text of the sweatshirt and the skull cap, that allow the image of Lang to come into focus. Thus, "the jury was able to speed up the process of teasing out obscure details in the video with the aid of [the detective's] testimony. That was helpful." (*People v. Son* (2020) 56 Cal.App.5th 689, 697.) As a result, the trial court did not err by admitting Jaeger's testimony identifying Lang as the driver of the white SUV.

3.

Lang contends Jaeger went "beyond identifying" Lang in the video when he testified Lang was the shooter. We agree Jaeger went "one step too far" in expressing an opinion on guilt, but we conclude (1) Lang did not preserve the issue and (2) it did not prejudice the verdict.

To preserve a claim of erroneous admission of evidence, a party must make a timely and specific objection. (Evid. Code, § 353(a).) "Failure to object on the specific ground later asserted . . . forfeits that ground on appeal." (*People v. Nadey* (2024) 16 Cal.5th 102, 150.) This requirement "allows the trial judge to consider excluding the evidence or limiting its admission." (*People v. Partida* (2005) 37 Cal.4th 428, 434.) The objection must "fairly inform" the trial judge of the specific reason for exclusion so the court "can make a fully informed ruling." (*Id.* at p. 435.) "A party cannot

13

argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*)

Here, Lang never objected when Jaeger testified that "suspect Lang . . . shoots into the vehicle" and "that's when the shooting occurs." As a result, he cannot claim error on that basis on appeal.

Although Lang objected to the annotated maps Jaeger created, Lang did not call the trial court's attention to where the maps went beyond identifying Lang as the driver of the white SUV. Of the twelve times Lang's name appears on the maps, two labels say, "Lang pulls up next to the victims and shoots them" and, "[a]fter shooting the victims[,] Lang leaves the area." Defense counsel objected generally to the labels saying "Lang this or that" but did not specify the two labels identifying Lang as the shooter. Instead, despite arguing "the only legal question for this whole trial is the identity of the shooter," defense counsel focused on how "it's a similar car and that's it." The trial court understood the objection as Lang's "argument regarding identification" more generally and overruled it.

We conclude the objection did not fairly inform the trial court there was a potential issue beyond identifying Lang as the driver of the SUV—which testimony, as discussed above, was admissible. Thus, any objection going specifically to the parts of the maps saying Lang was the shooter is forfeited.

Moreover, in his appellate briefing, Lang takes issue with his "name appearing on maps used as prosecution exhibits" without distinguishing between Jaeger identifying Lang's vehicle and Lang as the driver versus Jaeger asserting Lang shot the victims. Thus, to the extent Lang intended to include the map labels in his shooter argument on appeal, his argument is forfeited as underdeveloped. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

14

In any event, even if the claim were preserved, we conclude Jaeger's testimony and map labels calling Lang the shooter did not prejudice Lang.

"A witness may not express an opinion on a defendant's guilt," not because it goes to the "ultimate issue" of the case—"as opinion testimony often goes to the ultimate issue"—but because it does not help the jury. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

Lang contends the testimony identifying Lang as the shooter violated his Sixth and Fourteenth Amendment rights to have a jury decide the case and "rendered the trial fundamentally unfair in violation of due process." Thus, he believes we should assess prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24. But "[a]bsent fundamental unfairness, state law error in admitting evidence is subject to the traditional" test under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Partida*, 37 Cal.4th at p. 439.)

We are not persuaded admitting this evidence violated Lang's constitutional or due process rights. We agree a "trial court cannot constitutionally direct a verdict of guilt," but Lang identifies no such action here. Rather, the trial court instructed the jurors they "must decide what the facts are" and could "disregard all or any part of an opinion" they found unsupported by the evidence. In closing, the prosecutor never mentioned Jaeger identified Lang as the shooter, instead reminding the jurors their "job here is to tell us who did it."

To the extent Lang claims fundamental unfairness because "the jurors may well have believed [Jaeger] had some special knowledge or expertise which made his observations credible even if not supported by their own viewing of the videos," we disagree. Lang relies on *United States v. Grinage* (2nd Cir. 2004) 390 F.3d 746, 750; unlike the defendant in *Grinage*, however, he fails to point us to any testimony about Jaeger basing his

15

identification on his "'knowledge of the entire investigation'" or evidence not before the jury. Although Lang suggests the jury might have been confused because it was "instructed on both expert and lay opinion testimony, without specifying whether Jaeger was an expert," that argument ignores the record, which shows all experts and their areas of expertise were expressly identified during trial. As the People point out, the jury already knew Jaeger, as one of the arresting officers, thought Lang was the shooter. (Citing *People v. Riggs* (2008) 44 Cal.4th 248, 300.) And "[t]here was no implication from the questions or answers that [Jaeger's] opinions were based upon evidence that had not been presented to the jury." (*Ibid.*) Under these circumstances, our Supreme Court applied *Watson*. (*Id.* at p. 301.) We do the same here.

We conclude it is not reasonably probable Lang would have obtained a more favorable verdict absent this evidence. (*Watson*, 46 Cal.2d at p. 836.) Lang focuses on how Able testified there were two people in the white SUV and the shooter was Hispanic to argue "it was likely Mr. Lang was *not* the shooter." But the image, although blurry, of Lang driving the white SUV moments before the shooting, coupled with (1) cell phone records placing Lang in the area close in time before and after the shooting and (2) Lang lying to Jaeger about never being in Colton or associated with a white SUV, persuade us Jaeger's testimony did not prejudice the verdict.

4.

Lastly, Lang argues the identification error, "[a]t least in combination" with the other claimed errors, requires reversal.  Because we have found no preserved nor prejudicial error, this claim fails.

III.

We affirm the judgment.

CASTILLO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

17